Mr. Chief Justice TANEY
 

 delivered the opinion of the court.
 

 This is a case of collision in the port of Charleston, in South Carolina.
 

 . The brig James Gray took on hoard a valuable cargo at Charleston, destined foj Antwerp,--.and in the prosecution of her voyage hauled off from the wharf into the stream and an-.
 
 *186
 

 '
 
 cliored, on the 1st of February, 1856. The place where she anchored was in the harbor, and was the place where vessels bound out usually anchored for a short period, to make their filial preparations for sailing on their voyage. It was, however, a thoroughfare for vessels bound in, and through which they were almost continually passing. She remained there until the collision took place, which happened on the night óf the 5th of the month above mentioned, about seven o’clock, shortly after daylight had disappeared. • On that evening the John Fraser came in from sea, in tow of the General Clinch. The latter was a steamboat, occasionally employed in towing vessels in and out of the harbor, and was properly fitted and manned for that purpose.. There was ample- room on both sides of the James Gray for the tug and the tow to have passed with safety, if the James Gray had been seen in time. But she was not seen, either from the General Clinch or the John Fraser, until the steamboat was abreast of ber, and at the distance of not more than forty.or fifty fathoms. She was then for the first time seen by those on board the General Clinch, which had just before, and almost at the same moment, cast off the hawser by which she was towing the John Fraser. The towing line was about fifty fathoms in length, according to the testimony of the pilot of the General Clinch, and was attached to the larboard bow of the tow, and it was cast off by the General Clinch without any previous .notice of the intention to do so at that particular moment; and it appears to have been altogether unexpected on board the John Fraser. And as soon as She was cast off, and not. before, those on board of the John Fraser, for the first time, discovered the James Gray directly ahead, and upon which she was running. She endeavored to avoid her by putting her helm hard to starboard, in order to pass on the same side and in the wake of the tug; her speed, however, fróm the tide and the impulse she had received from the steamboat, was then about six knots an hour; and she reached the brig before her course could be sufficiently changed to avoid a collision. The rigging of the John Fraser became entangled in the bowsprit of the. brig which it earned aw^vy. and caused other damage to the vessel to senous amount.
 

 
 *187
 
 So far the facts are undisputed; we come now to the points in controversy.
 

 The libel is filed
 
 in rem
 
 by the owners of the James Gray against the ships above mentioned, alleging that she was free from fault, and that the damage was occasioned altogether by their negligence and mismanagement, and claiming the right to charge them with the whole amount of the loss sustained.
 

 The owners of the John Eraser and the owners of the Gem eral Clinch answer separately, each of them charging-the misconduct of 'the James Gray as the cause of the disaster, but each- of them also imputing some degree of blame to each other..
 

 They charge against the James Gray that she was lying in a thoroughfare in the harbor, in violation of the local port regulations, and without the light that these regulations required. And they produce two ordinances of the corporate authorities of the city of Charleston, one of which provides that no vessel shall lie in this thoroughfare for more than twenty-four hours, and inflicts certain penalties for every • disobedience of this ordinance; and the other requires all vessels anchored in the harbor to keep a light burning .on board from dark until daylight, suspended conspicuously midships, twenty feet high from the deck.
 

 The power of the city authorities to pass and enforce these two ordinances is disputed by the libellants. But regulations of this kind are necessary and indispensable in every commercial port, for the convenience and safety of commerce. And the local authorities have a right to prescribe at what wharf a vessel may lie, and how long she may remain there, where she may unload or take on board particular cargoes, where she may anchor in the harbor, and for what time, and what description of light she shall display at night to warn the passing vessels of her position, and that she is at anchor and not- under sail. They are like to the local usages of navigation in different-ports, and every vessel, from whatever part of the world she may Come, is bound to take notice of them and conform to them. And there is nothing in the regulations referred to in the port'of Charleston which is in conflict with any law of Con
 
 *188
 
 gress regulating commerce, or with the general admiralty juris-. diction conferred on the courts of the United States.
 

 Yet, upon the evidence before the court, we do not think the James Gray ought to be regarded as. in fault, by remaining at anchor in the harbor beyond the time' limited in the city ordinance. She was seen there by the harbor-master day after day, without being ordered to depart;’ nor did he seek to inflict the penalty. The object of this regulation was obviously to prevent this thoroughfare from being crowded by vessels at anchor, which would make it inconvenient' or hazardous to vessels coming into the port. And from the conduct and testimony of the harbormaster, it may be fairly inferred that this regulation was not strictly enforced -when the thoroughfare was not over-crowded, and that single vessels were sometimes permitted to remain beyond the time fixed by the ordinance, without molestation from the city authorities. And this lax execution of the regulation would soon become a usage in the poi’t, and will account for the indiffex’ence with -which the harbor-master saw her lying there three days beyond the limited time, without even remonstrance or complaint. He appears to have acquiesced. And if this was the interpretation of the ox’dinance by the local authorities, it ought not to be moi’e rigidly interpreted and enforced by this court.
 

 But the omission of the light prescribed by the regulation stands on different grounds. There was certainly no acquiescence of the local authorities in that respect; and, upon the - testimony, it is a matter of dispute whether she had any light or not. That question will be considered hereafter. . But it is admitted on all hands that she had not a light suspended conspicuously midships, twenty feet above the. deck, as the regulation requires; and the light which she alleges she used was not the ordinary globe lamp used by vessels at anchor, but a lantern of triangular form, with one side dark, and the light shining only through the other .two, and which, consequently, could not be seen by those who approached on the dark side. The ordinance obviously contemplated the usual signal light of a vessel at anchor, which is bi’ight on every side, and can be seen by those who are approaching from any direc
 
 *189
 
 tion. And as the regulations of the port required a light of this kind, suspended in the manner hereinbefore mentioned, the James Gray could not be justified in disregarding this regulation, and substituting a light of a different description, and placed in a different part of the vessel. Those who were coming into port had a right to presume that a vessel anchored in this thoroughfare would have the light prescribed by the port regulations. They would look for no other, nor expect to find a vessel in their'way without one, and might be misled as to the. exact position of the vessel, if a light of a different character was shown or hung up in a different place. And as the light* of the-brig (if she had one) differed in character and placeffrom the one which the .regulations and usages of the pbrt required, and which incoming vessels would look for, she committed a fault which justly subjects her to damages for''the collision. She had not taken those means to avoid it which the regulations of the port in which she was lying required and prescribed.
 

 But, apart‘from the regulations of the local authorities, we think the James Gray was in fault upon the established principles of maritime law. She was at anchor at a place where vessels were continually passing. It was her duty, therefore, to show- at night the usual signal light of a vessel at anchor— that is,’ a globe lamp, or one without any dark side to it, which could be seen from any direction, and hung high enough in . the rigging to be seen at a distance.
 

 The witnesses who were on board of the General Clinch and the John Eraser say she had no light of any kind immediately before and at the time of the collision; and in this they are supported by the testimony of other witnesses who were observing- her about the same time. But’ those who were on board of the James Gray testify to the contrary, and their testimony'is confirmed by others; and we think that, upon the whole evidence, the just conclusion is that she had a light, in a lantern of triangular form, with one dark side, banging on the fóre swiftsure,'twenty feet and some inches above the deck. The fore swiftsure. is, we .understand, the foremost rope of the-foremast Shrouds.
 

 
 *190
 
 Now, a light of this description is not ordinarily used as a signal light for a vessel at anchor; hut is used at sea, fastened at the bowsprit, with the opaque side.to the ship, so as to throw a strong light ahead. And it is obvious that such a lantern, fastened to a single rope at the top only, and more than twenty feet from the deck, would be iiable to waver, from the motion of the vessel as she was ridiug at anchor, and to turn its dark side sometimes in one direction and sometimes in another; and if such a light was used as a signal light, it was more especially the duty of those in charge of the brig to see that the lamp was securely fastened, so as to present its bright sides in the direction in which vessels were likely to approach.
 

 But this is not proved to have been done. It is true that one of the witnesses for the libellants (Wycoffe) says it was securely fastened at the top and the bottom, with the dark side tó' the stern. This may have been the way in which it was usually fastened, but none of the witnesses examined by the libellants know how it.was fastened that night. Wycoffe does not appear to have even been on deck when it was put up. It was put up by a boy; and when the light appeared dim after the collision, Wycoffe says he started to take it down ; but the boy was too quick for him, and took it down and trimmed it.
 

 The second mate, who gave the order to the boy to put it up, went below to his tea immediately afterwards, without waiting to see that his order was properly executed; and the first mate went down with him; and no one but this boy appears to have known how it was fastened to the rope that night. He was not examined as a witness, nor is his name mentioned. They speak of him as “ the boy,” and we think it was great want of care on the part- of the officer in charge of the deck to confide this important .duty to the heedlessness of a boy. His age is not stated, nor his previous pursuits, nor how long he had been pn boárd, nor his knowledge or fitness for the duty intrusted to him. The place where the brig was anchored, and the’character of the light they were about to display, made it the more imperatively the. duty of the officers to see that it was securely and properly fastened, so as to present the bright sides to the incoming vessels, as she was in most danger of being
 
 *191
 
 i:nn into by them. But without the testimony of the boy who put it up and took it down, or any proof of his age and character, from which it might be inferred that the duty was well and faithfully performed, the court cannot say that a sufficient light was displayed to warn vessels coming into the harbor that she was at anchor in this thoroughfare.
 

 Indeed,' the just inference from the testimony would be otherwise ; for if the lantern was carelessly hung, and liable to move to some extent from one to the other, so as at one monlent to present its bright side, and a moment after its dark side in the same direction, it would account for the difference •in the testimony of different witnesses, who looked at her from the same point of view, some testifying that she had no light, and others that she had a very bright one.
 

 Independently, therefore, of the local regulations, the James Gray, upon the general principles of maritime law and usages, cannot be acquitted of negligence, and must share in the loss.
 

 But the conduct of those on board of the General Clinch was equally culpable. Eor if, as they contend, the brig showed no light, or if the dai’k side of the lantern was turned towards her when she 'was approaching, yet it is satisfactorily proved that the night was light enough to have enabled her to see the brig at a distance abundantly sufficient to pass with her tow without danger to either, and that she must or would have been seen with a proper look-out.
 

 The General Clinch was not under the control of the cap- ' tain of the John Eraser, but under the command and direction of her own pilot, who was substituted for her regular captain, who was not on board. She could select her own course and her own rate of speed, and was bound to keep a vigilant and competent look-out in thé thoroughfare in which vessels so frequently anchored. . But there is no proof to. show that this was done. The three hands who were at the stern of the steamboat, awaiting the order to cast off the hawser, were certainly not look-outs. The pilot who was in command had his attention drawn to other matters, and was preparing to give the order to cast loose the hawser, and in communicating with the ship he had in tów. . It is said, indeed, that there were two
 
 *192
 
 of the crew in the forward part of the vessel, whose duty it was to keep a look-out; but, being colored persons, they could not, by the laws of South Carolina, be examined as witnesses. Rut the law requires of a colliding vessel, that she shall prove not only that she had a competent look-out stationed at the proper place, but also that the look-out was vigilantly performing his duty. And'if he placed there persons who cannot be witnesses, it is his own fault; it was his awn voluntary act, and can therefore be no sufficient reason for the absence of that proof which the law requires him- to produce.
 

 It was especially the duty of the officer in command of the steamboat,, in a crowded harbor like that, when his tow was following him at the rate of six or seven miles an hour, and her course, necessarily directed by the steam-tug,, to have ^canned carefully the surrounding objects before he cast loose the tow lin.e, and to see that there was nothing in the way of the,tow which she-could -not gvoid by means of her own rudder, without the aid of the steamboat, and, also to have given,' reasonable notice of his intention, in order that she might prepare -to take care of herself. Rut this was not done. ■ He suddenly let go the towing line, without notice or warming to the John Eraser. And the moment after he had done so, and not before, he finds his own vessel almost aboard of a vessel at anchor, and the head of the John Eraser, under the direction and impulse his ship had. given her, directed upon the anchored vessel, and too near to avoid a collision when she had lost the aid of the General Clinch. '
 

 This -state of things could not have happened without' great want of care on the part of the steam-tug. Indeed, this negligence is apparent from the. testimony of the pilot himself,- who/ was acting as captain. ■ • He says hi's station was on the wheel-' house; and that afterhe let go the John Eraser, he had just time to'walk from the bow to the aft part of the steamer, when he saw the Gray. She was not, therefore, first seen from the wheel-house or the bow, but from the stern of his vessel, when he was nearer to' her than he was to .the ship he was towing. The stern"'of the vessel is. not the first place from which the James Gray would have been seen, if-.the wheel-house was'a
 
 *193
 
 proper place, and he had performed there the duty of a lookout. And as regards the two hands which he states were forward as look-outs, .they appear never to have seen the brig .until after she was discovered by the .pilot from the stern, when in .the act.of passing her bow, for they gave no notice of a vessel ahead, and do not appear to haye seen her: before her proximity was .announced by the -pilot. If stationed forward as lookouts, it is.very clear that they were not performing that duty, and the collision was the natural'eohsequenee of their negligence; for the James Gray was plainly seen from the John Eraser, the instant the steam-tug dropped the tow line and turned out of her way; and as the tow line was fifty fathoms, long, the. steamboat could unquestionably also have seen her as she approached her, at least at that distance ahead, ’ as well as front the stern; and if she had been seen even at that distance, and the General Clinch had held' ou to the hawser, she could have carried the John Fraser safely past, and.without danger.
 

 And upon such proofs of negligence and .of want of proper caution, the court is of opinion that the General Clinch is justly answerable, as well as the James Gray, forthe consequences of this disaster.
 

 So far as the ship John Fraser is concerned, we see nothing in the evidence from which any fault or mismanagement can justly be imputed' to her. According to the usage of trade at that port, she engaged a steamboat, well acquainted • with the harbor and its usages, to bring her in.. When fastened to the hawser, and in tow, she was controlled entirely by the steam-tug, both as to her course and speed. The steamboat was not subject to the orders-of the commander of the John Fraser, but was altogether under the control and direction of her own commander for th§ time. A look-out on board of the John Fraser would be of little or no value, for the view ahead was obstructed by the steam-tug, and she could do-nothing more than watch the motion^ of the steamboat, and . use her own rudder, so as to keep her as nearly as might be in the wake of the tug 'to which she was attached. She had a right to suppose that a proper look-out would be kept by the
 
 *194
 
 steamboat, and that she would not be led into dangers from which no effort on her part would enable her to.escape.' And she was brought into this dangerous proximity to the Jamesi Gray, and then cast loose, under, circumstances which rendered a collision inevitable; and she was driven against the vessel at anchor altogether by the direction and impulse which she received from the controlling power of the steamboat, and not by any act of negligence or mismanagement on her part.
 

 It is indeed said by some of the witnesses, that if she had put her helm to the larboard, instead of the starboard,, as soon as she was cast off, she might have passed in safety on the other side . of the James Gray. But the weight of the proof is clearly to the contrary; and we are convinced that she adopted the only chance for safety, by putting her helm to starboard, and endeavoring to pass on the same side that the steam-tug had passed. •
 

 It is true, that the -John Eraser was the
 
 res
 
 or thing which struck the James Gray, and did the damage. But the mere fact that one vessel strikes and damages another, does not of itself make her liable'for-the injury; the collision must'in some degree be occasioned by her fault. • A ship properly secured may, by the violence of a storm, be driven from her moorings and forced against another vessel, in spite of her efforts to avoid it. Yet she certainly would not be liable for damages which it was not in her power to prevent. So also ships at sea, from storm or darkness of the weather, may come in collision with one another, without fault on either side; and in that case, each must bear its own loss, although one is much more injured than the other. This was decided by this court in the case of Stainback et al.
 
 v.
 
 Rae et al., (14 How., 532;) and the decision placed upon the ground that neither of them had committed a fault, and could not therefore justly be charged with any portion of the injury which the other had sustained. And as this collision was forced upon the John Eraser by the controlling power and mismanagement of the steam-tug, and not- by any.. fault or negligence on her part, sheiought not to be answerable for the consequences.
 

 The result of.this opinion is, that the loss must be equally
 
 *195
 
 divided between the James Gray and the General Clinch, according to the rule laid down by this court in the case of the Schooner Catharine et al.
 
 v.
 
 Dickinson et al., (17 How., 170.)
 

 The decree of the Circuit Court is therefore reversed
 
 ‘,
 
 and the case remanded, with directions to adjust the loss upon the principles stated in this opinion.-
 

 We do not assent to so much of this opinion as makes the “James Gray” liable for negligence, merely for want of exact conformity to port regulations.
 

 S. NELSON.
 

 R. C. GRIER.
 

 NATHAN CLIFFORD.