### ROOSEVELT and others *vs.* GODARD and others.

In determining the question whether a particular statute is obnoxious to the objection that it is in conflict with the constitution, it is to be presumed that such statute was not passed without mature reflection and full consideration of the provisions contained therein, and of the well settled constitutional principles relating to them.

It is not only to be presumed to be constitutional, but the authority of the court to declare it void will only be resorted to in a clear case of conflict.

The act of the legislature, of May 22, 1862, " defining and regulating the powers, duties and compensation of the captain of the port and harbor mas-

Roosevelt *v.* Godard.

ters of the port of New York," (*Laws of* 1862, *ch.* 487,) by which the captain of the port is directed to set apart, keep and reserve the waters from pier No. 2 to the east side of pier No. 9, East river, for the exclusive use of canal boats, &c. during a certain portion of the year, and the act of May 23, 1867, "to regulate the use of certain slips, piers and wharves on the East river in the city of New York," (*Laws of* 1867, *ch.* 945,) by which the waters from pier No. 2 to the west side of pier No. 10 are set apart for the same use during the same period, and the captain of the port and the harbor masters are directed to prevent all other vessels from lying at said wharves when required for canal boats, are not unconstitutional for the reason that no compensation to the owners of the wharves and adjacent slips is provided, for the loss of gains and emoluments occasioned by the enforcement of such laws; nor because they are within the prohibition that no person shall be deprived of his property without due process of law.

The act of 1867 having provided rules for the government of the subject embraced in both acts different from, and less restricted than those prescribed by the act of 1862, it is in that respect entirely inconsistent with that act; and so far must necessarily work its repeal by way of implication, and be deemed to have removed the absolute restriction imposed by the previous act.

And giving the act of 1867 that effect, it constitues a mere police regulation of the business of the harbor, which can neither be regarded as unjust or unreasonable.

Legislation of this nature does not deprive the owners of the wharves to which it relates of any of their rights or privileges. It merely regulates the manner in which they are to be used and enjoyed, for the purpose of promoting the business, security and good order of the harbor. It does not deprive the owner of his property, nor subject it to new uses, or prevent him from devoting it to the lawful uses and purposes for which it has been adapted and designed; but it merely prescribes the manner in which those uses and purposes are to be subserved by it. *Per* DANIELS, J.

APPEAL from an order made at a special term overruling a demurrer to the complaint.

*H. W. Johnson,* for the appellants.

*T. S. Alexandar,* and *J. F. Daly,* for the respondents. I. The act of 1867, chapter 945, contemplates an invasion of proprietary rights of the plaintiffs, as owners of the said piers, with their adjacent slips and wharves, and is therefore unconstitutional and void. The constitution,

Roosevelt *v.* Godard.

article 1, section 6, provides "No person shall * * * be deprived of his liberty or property without due process of law; nor shall private property be taken for public use without compensation."

In *Taylor* v. *Porter*, (4 *Hill*, 140,) Justice Bronson says: "The right of property is invaded whenever the owner is deprived of the beneficial use and enjoyment of his property. The quantum of interest taken from him is immaterial. It is enough that some interest, some portion of his estate, no matter how small, has been taken from him without his consent." *In re Hamilton avenue*, (14 *Barb.* 405,) it was declared that a franchise is taken when the party to whom it has belonged is deprived of the power or means of exercising it. In *Osborne* v. *Bank U. S.* (9 *Wheat.* 341,) the opinion is clearly expressed that an exclusive privilege or franchise is violated by an effort to participate in it, and that it is in this very class of cases of partial invasion that equity has most frequently interfered. The wrongs complained of in this case are, specifically: 1. That all vessels, (except canal boats,) which form the most profitable class of customers, are excluded from the use of the piers—practically excluded; since a merchandise vessel if it gains a berth, at a moment when the pier is unoccupied, may be compelled, by day or by night, in fair weather or foul, and while engaged in receiving or discharging a cargo, to unloose her fastenings and fall into the stream in order to make place for an after coming canal boat or barge. 2. The owners of any line of canal boats or barges are priviledged to erect derricks or other structures, on the piers, for their own exclusive use and enjoyment, and, as a necessary consequence, to appropriate such portions of the piers as may be occupied for their convenient use. The owner of every independent line of canal boats or barges may exercise a like privilege of appropriation, and the only restraint on the exercise of the privilege is to be found in this, that the structure shall be "suitable," not indis-

pensable or necessary, to the loading or unloading of canal boats or barges. It will therefore require no great stretch of imagination to suppose that the entire water lines of these piers, with their slips and wharves, will be occupied by fixtures which will be so located, constructed and arranged as may best suit the convenience of those by whom they may be erected, and may the most embarrass the owners of competing lines of canal boats. Over the subject of location, or form of construction, the wharf masters, or the proprietors of the piers, can exercise no control. 3. The rates of wharfage on canal boats and barges are less than those which may be charged against sea going vessels. But other causes will effect yet other diminutions of the profit of the proprietors of the piers. The owner of a line of canal boats or barges who may have appropriated a part of the pier, will be under no obligation to furnish a succession of canal boats or barges equal to the reasonable capacity for accommodation of the part of the pier appropriated. The canal boats and barges of other lines will be practically excluded from the parts thus preoccupied, since they cannot avail themselves of the structures thereon erected. And for the space of three or four months of the year, during which canal boats and barges are laid up, those permanent fixtures will obstruct the use of the piers by sea-going vessels. 4. The law will operate yet more unjustly and oppressively, if enforced, as it affects to confer on the owners of lines of canal boats and barges a power of use and appropriation of the piers which the law denies to the proprietors of the piers themselves. A derrick, permanently affixed to the pier by the proprietor thereof, would be liable to be abated as a nuisance. In *Com'rs of Pilots* v. *Clark,* (33 *N. Y. Rep.* 251,) it is adjudged that the owner of a public landing cannot make any erection thereon which may obstruct or inconvenience any wayfarer having occasion to use the landing. As a necessary corollary from the ruling of the court, it must

result that no like structure can be erected by any other than the owner.   The question whether a given erection on a public wharf is, or is not, a nuisance, depends altogether on this other question, whether it has a tendency to obstruct or inconvenience those who have occasion to frequent the wharf?   And this tendency would be the same in contemplation of the law, whether the supposed obstruction was erected by the owner of the wharf or a stranger. If the owner creates the obstruction he is guilty of an abuse of his franchise.   If created by another, it is a violation of the franchise.   The wrong when committed by the stranger, is not the less, because it is done under color of a statute passed since the grant or creation of the franchise.

II. The statute, in authorizing the owners of lines of canal boats or barges to construct fixtures on the piers of the plaintiffs, and thus to appropriate to their exclusive use the portions of the piers on which such fixtures are attached, contemplates a taking of private property for private use, which is clearly beyond the power of the legislature.   (*Taylor* v. *Porter*, 4 *Hill*, 140.   *In re Albany street*, 11 *Wend.* 149.   *Charles River Bridge* v. *Warren Bridge*, 11 *Peters*, 642.)   But it will not be necessary to enlarge on this position.   It cannot be pretended that the act in question was passed in the exercise of the power of eminent domain.

The *Constitution*, (*art.* 1, § 7,) provides, that when private property shall be taken for any public use, the compensation to be made therefor, when such compensation shall not be made by the state, shall be ascertained by a jury, or by not less than three commissioners, appointed by a court of record, as shall be prescribed by law.   No such proceeding has been instituted, nor is any contemplated by the act.   1. The act is to be sustained, if at all, as an exercise of the power of police or regulation ; and it is conceded that the state may rightfully authorize the harbor masters to place vessels with a view to the general

convenience of trade; so that one vessel on assuming its berth, shall not incommode another in the enjoyment of the berth already occupied by this other, nor appropriate to itself a greater extent of wharf facility than is necessary for the convenient loading or unloading of its cargo, nor delay its sailing to the prejudice of others. (*Vanderbilt* v. *Adams*, (7 *Cowen*, 349.) 2. But there is an extreme difference between a mere police regulation in regard to the mode of exercising a franchise on the one side and a taking. or controlling of the beneficial use and enjoyment of the franchise on the other; and this distinction is illustrated by the case of *Wynehamer* v. *People*, (13 *N. Y. Rep.* 378,) where an act of the legislature was adjudged to be unconstitutional and void, which prohibited the sale of spirituous liquor that had been legitimately acquired by the owner prior to the enactment. At the same time it was declared that the legislature might provide for licensing places for the sale of spirituous liquors, or otherwise regulate the sale thereof, with a view to the peace and good order of society, and might even prohibit for the future the distilling of spirituous liquors, and the sale of such subsequent distillations. The question, therefore is, whether the law proposes a police regulation merely, or an invasion of the proprietary rights? The question may be illustrated by suggesting cases which, though extreme and improbable in circumstances, would not differ in principle from the case with which we are actually dealing. What would be thought of a law which proposed to appropriate those piers exclusively to the use of emigrant vessels, to empower the owners to erect sheds or other shelter for the storage of the baggage of emigrants on the piers, or to appropriate the warehouses on the adjacent land to like purposes? Or, again, if the legislature, at the instance of the Fifth Avenue Hotel, should require the St. Nicholas to accommodate drovers or others at half prices, or the Metropolitan to take in emigrants at quarter of the prices charged to

first class customers; could such law be maintained as constitutional?

III. The jurisdiction of equity, in a proper case, to grant an injunction against a public officer would seem to be unquestionable. It is conceded that the court may restrain municipal officers from the exercise of powers not legally delegated to them. But municipal officers within their respective spheres of action are public officers, and there are very few officers ostensibly and nominally state officers, whose powers are more extensive, and the exercise of whose powers affect more seriously the public interests than the mayor of New York. If then the mayor of New York may be subject to the jurisdiction of this court, why may not the same power be extended to a harbor master? In *Frewin* v. *Lewis*, (4 *Myl. & Cress.* 254,) Lord Cottenham has expressed himself on the subject: " I apprehend that the limits within which this court interferes with the acts of a body of public functionaries, constituted like the poor law commissioners, are perfectly clear and unambiguous. So long as those functionaries strictly confine themselves within the exercise of those duties which are confided to them by the law, this court will not interfere. The court will not interfere to see whether any alteration or regulation which they may direct is good or bad; but if they are departing from that power which the law has vested in them—if they are assuming a power over property which the law does not give them, this court no longer considers them as acting under the authority of their commission, but treats them, whether they be a corporation or individuals merely, as persons dealing with property without legal authority." If such is the principle, it must be of no moment whether the officer, whose acts are impeached, derives his assumed authority directly from the sovereign power, or immediately from powers organized under the sovereign; and in *Osborne* v. *Bank of United States,* (9 *Wheat.* 338,) the

Supreme Court affirmed its right to enforce an injunction against the auditor of the state, who had been charged with the duty of levying a tax on a branch of the Bank of the United States. The relief was asked, and awarded, on the ground that the act imposing the tax was unconstitutional. The common law writ of mandamus partakes strongly of the character of the writ of injunction. It is used indifferently as a remedial and preventive process, and in all the leading cases on the subject, the writ was asked and issued against high public functionaries. In *Marlbury* v. *Madison,* (1 *Cranch,* 137,) the writ was issued against the secretary of state. In *Kendall* v. *Stockton,* (12 *Peters,* 524,) the writ was issued against the postmaster general. And that, in a proper case, a mandamus may be issued against the secretary of the treasury, secretary of the navy, register of the land office, commissioner of patents, or superintendent of printing, is evident from *Reeside* v. *Walker,* (11 *How.* 272;) *United States* v. *Guthrie,* (17 *id.* 284;) *Decatur* v. *Paulding,* (*Id.* 225;) *Brashear* v. *Marion,* (6 *id.* 92;) *McClurry* v. *Silliman,* (2 *Wheat,* 369;) *United States* v. *Commissioner,* (5 *Wallace,* 563;) *Commissioner* v. *Whitely,* (4 *id.* 522;) *United States* v. *Seaman,* (17 *How.* 223.) And that the remedy is equally extensive in England is evident from *Rex* v. *Lords of the Treasury,* (4 *A. & E.* 286;) *Reg.* v. *Same,* (4 *Law and Eq.* 277.)

IV. The inability of the common law to give a plain and adequate remedy is the test of equity jurisdiction even in the courts of the United States. (*Watson* v. *Sutherland,* 5 *Wallace,* 74.) The writ of injunction is granted on the principle of preventing irreparable mischief and multiplicity of suits, and insuring to the suitor an adequate remedy against threatened wrongs. (*See* 2 *Story's Eq.* § 928.) 1. In the present case the appropriation of the entire water lines of those piers, with their slips and wharves, would inflict irreparable injury upon the plaintiffs' property in these piers; and 2. Would in-

Roosevelt *v.* Godard.

volve the plaintiff in a multiplicity of suits, as a separate action would be necessary to remedy each separate aggression. 3. The measure of damages at law would be uncertain and inadequate. It would be difficult to ascertain the pecuniary loss which the plaintiffs might sustain by the aggregate of invasions on their proprietary rights. And if this aggregate were susceptible of ascertainment, it would be impossible to apportion that aggregate amongst the several trespassers. If, for example, the receipts of the plaintiffs during the year next succeeding the first act of aggression on their rights, under color of this law, should be less than one half of the wharfages realized during the preceding year, it would remain open for discussion, whether such loss was attributable to the acts of aggression done under color of the law, or to other accidental causes? and distributively what share of this aggregate of loss should be imputed to the first, second and other successive acts of aggression? In brief, although the plaintiffs might recover against an individual trespasser the damages occasioned by his original trespass, or his continued trespasses, it would be impossible to assess against him, as "consequential damages," the whole, or any definite part or proportion of the losses which the plaintiffs might have sustained by the diminished customs to their piers.

V. The complaint states a case of threatened wrong with sufficient certainty to warrant the interposition of equity. In *Osborne* v. *Bank of the United States,* (9 *Wheat.* 339,) the Supreme Court held that the declarations by the auditor of his purpose to enforce a law which was impeached as unconstitutional, was sufficient probable cause of apprehension to warrant the appeal to the court of equity. The same proposition is affirmed in *Bonaparte* v. *Camden and Amboy Railroad Company,* (1 *Baldwin,* 205,) and in numerous other cases there cited.

*By the Court,* DANIELS, J.   The plaintiffs have brought this action for the purpose of restraining such of the defendants as include the captain of the port and the harbor masters of the city of New York from carrying into execution the provisions of certain acts of the legislature which are substantially set forth in the complaint. These acts were passed on the twenty-second of May, 1862, and the twenty-third of°May, 1867.   (*Laws of* 1862, *p.* 979, §§ 3, 4, *and of* 1867, *p.* 2382.)   By the first of these acts it was provided that the captain of the port should set apart, keep and reserve all that part of the water adjacent to the wharves in the city of New York, from the east side of pier number two, to the east side of pier number nine, from the twentieth of March to the first of January in each year, for the exclusive use and accommodation of canal boats, and barges engaged in the business of transporting property on the Hudson river, or coming to tide water from the state canals, or from Albany, or any place north or west of Albany.   And between those periods in each year, all other vessels were prohibited from entering or using such waters, without the written consent of the captain of the port, and in that case only between the first day of January and the twentieth of March, under a penalty of $100 for each day that such vessel should remain there after being notified to leave by one of the harbor masters or the captain of the port.

The act of 1867 extended the previous operation of the act of 1862, to the west side of pier number ten, and repeated the appropriation of the waters included within the extended limits to the boats and barges mentioned in the previous act, and the lighters engaged in loading or unloading them.   This act of 1867 provides that the waters of the harbor included within the described limits shall be set apart, kept and reserved for the exclusive use and accommodation of such canal boats, barges and lighters between the twentieth of March and the last

day of December in each year. And it renders it the duty of the captain of the port, and the harbor masters of the city and of all officers empowered by any law, or by an ordinance of the city, to regulate or station ships and vessels in the harbor, to prohibit and prevent all other boats, ships or vessels from entering any of the slips, or approaching or lying at any of the wharves between such piers, when the slips, or the wharves connected with them, shall be required for the use and accommodation of such canal boats and barges. And whenever any portion of the waters of the harbor between such piers shall be occupied by any ship or vessel not entitled to occupy them under the provisions of the acts, and the proprietor or proprietors, or person in charge of any canal boat or barge, shall desire to use the berth or slip so occupied, it is made the duty of the captain of the port and of the harbor master of the city in charge of the district, upon the request of such person or persons, forthwith to remove the ship or vessel so far as may be necessary to accommodate the canal boat or barge for whose convenience the application may be made. And for every failure to perform that duty, the captain of the port, or harbor master of the district, who may be required to perform it, is rendered liable to a penalty of $50.

The plaintiffs, in their complaint, allege that they are the owners of certain wharves within the district included in the acts. And that they are informed and believe, and are apprehensive, that these provisions of these acts are about to carried into effect by the officers upon whom that duty has been imposed, and who are made defendants in the present action. It is also alleged that the gains and emoluments arising from the appropriation of the wharves and adjacent slips to the business and use of other ships and vessels are much greater than the laws allow to be collected from canal boats and barges. And that the enforcement of these laws will deprive the plaintiffs of such

profits and emoluments, and materially reduce the value of their property. As no compensation is provided for the loss they allege will be occasioned to them by the enforcement of the acts, the plaintiffs claim that they are unconstitutional. They also insist that these provisions are within the prohibition that no person shall be deprived of his property without due process of law.

To determine whether these provisions are in conflict with the prohibitions of the constitution, is a difficult and delicate duty, as it usually is to determine controversies of this character. For the purpose of determining this, it is not necessary to bestow any time upon the consideration of the provision contained in the act of 1867, which allows the owners of any regular line of canal boats or barges to erect derricks upon the wharves for loading and unloading such boats. For no power to erect derricks is given to the officers who are made defendants in this action, or to any other persons than the proprietors of some regular line of canal boats or barges. These derricks, it is true, are to be erected, if they are erected at all, under such regulations as are to be adopted and prescribed by the captain of the port. But as it is not alleged that any such regulations are at present either made or contemplated, or that either of the parties to this action at any time intends to erect any derrick under this act, the simple power to do it would not disclose a sufficient ground for the issuing of an injunction to restrain its exercise. It is only when the rights of the parties are about to be, or are in danger of being irreparably injured by the execution of an unwarranted or unlawful assumption and use of power, that this court can properly interfere to restrain and prevent it. And such a case is not made or presented under this provision of the act. The only question involved in this case, therefore, is whether the provisions of the acts, as they have been previously considered, are obnoxious to the objection that they are

in conflict with the constitution. And for the purpose of properly determining it, the effect of these provisions must be carefully and clearly ascertained.

But before proceeding to do that, it will facilitate the investigation to refer to certain well settled rules of construction which are particularly applicable to this subject. Under these rules it is to be presumed that the acts in controversy were not passed without mature reflection and full consideration of the provisions contained in them, and of the well settled constitutional principles relating to them. They are not only to be presumed to be constitutional, but that the authority of the court to declare them void will only be resorted to in a clear case of conflict. (*Boston* v. *Cummins,* 16 *Geo. Rep.* 102. *Norwich* v. *County Comr's,* 13 *Pick.* 60. *Charles River Bridge* v. *Warren Bridge,* 7 *id.* 416.) Washington, J. says: "It is but a decent respect due to the wisdom, the integrity and the patriotism of the legislative body by which any law is passed, to presume in favor of its validity, until its violation of the constitution is proved beyond all reasonable doubt." (*Ogden* v. *Saunders,* 12 *Wheat.* 270,) And when the constitutional validity is in controversy and the law itself may be ambiguous in its import, that construction must be given to it which will sustain its validity, rather than the one which will render it inoperative and void. Under these principles, the first thing to be accomplished is to determine what is the actual effect of the statutory provisions involved in this case.

The statute of 1862, is manifestly much more stringent in its provisions than that of 1867. For it required that part of the harbor specifically mentioned in it to be exclusively appropriated for the use of the canal boats and barges designated from the 20th of March to the 1st of January, in each year. And other ships and vessels were not during that period of the year to be permitted to enter

or make use of the waters appropriated for that purpose. For they could according to this act, only enter and use that part of the harbor under the written permission of the captain of the port; and he was allowed to give that, only for the period intervening between the 1st of January and the 20th of March.

But although the act of 1867, makes use of some general terms equally exclusive, it was evidently not intended to be as much so in this respect, as the act of 1862. For while it provides that this portion of the harbor shall be set apart, kept and reserved for the exclusive use and accommodation of the canal boats and barges, and renders it the duty of the captain of the port and the harbor masters, to prohibit and prevent all other boats, ships or vessels from entering it, or approaching or lying at the wharves between the piers mentioned, this is only to be done when the slips or wharves connected with them, shall be required for the use and accommodation of the canal boats and barges. This is a qualifying clause of a general and extended nature, as broad and comprehensive as the previous provisions of the law. And it must, therefore, have been intended to restrict the exclusive appropriation of this portion of the harbor, to the time only, during which it should be required for the accomodation of the canal boats and barges entitled to use it under the provisions adopted. This intention is rendered more manifest by what is afterwards found to follow, regarding the duties of the officers to move other ships and vessels found in this part of the harbor. For while that is required to be done at the request of the proprietor, or proprietors, or persons in charge of the canal boat or barge, and the officer is thereupon forthwith to remove such ship or vessel, the removal is to be made so far only as may be necessary to accommodate the canal boat or barge.

These provisions of the law are all required to be considered in ascertaining and determining its meaning. And

Roosevelt *v.* Godard.

appropriate effect must be given to them according to the import of the language made use of, so far as that can be consistently done in view of the terms previously employed. By construing those terms in their general and unresticted sense, all ships and vessels, except canal boats and barges, and the lighters loading or unloading them, would necessarily be excluded from this portion of the harbor, at all times during the period intervening between the 20th of March and the last day of December, whether the canal boats, barges and lighters used it or not, which certainly would be, as it was in the act of 1862, a most unjust as well as unreasonable restriction in the use of this property, and one that should not without the most cogent reason for it, be attributed to the power that enacted the statute of 1867. No such reasons exist in this instance. For such a construction of the act would be directly opposed to the other provisions subsequently contained in it. By adopting it, those provisions would be rendered nugatory and of no effect whatsoever, which declare that the other ships and vessels are to be prohibited and prevented from approaching or lying at the wharves between those piers, when such slips and wharves shall be required for the use and accommodation of canal boats and barges, and that the officers, for their accommodation, shall, upon the request of their proprietors, or the persons in charge of them, remove the ships and vessels that may be occupying this part of the harbor, so far as such removal may be necessary for that purpose.

These provisions of the law fairly imply that other ships and vessels may make use of this part of the harbor, when it shall not be required for canal boats and barges. For the only interference that it allows in this respect is expressly made dependent upon the circumstance, that for the time, the harbor shall be required for the use of canal boats and barges. When it is required, other ships and vessels are to be prohibited and prevented from entering,

and if they are already there, then they are to be removed, not from this part of the harbor entirely, but only so far as may be necessary for the use and accommodation of the canal boat or barge, on whose account the removal may be made. The statute, by providing that the other ships and vessels shall be prohibited and prevented from entering when this portion of the harbor may be required for the canal boats and barges, and that they shall be removed when occupying it, so far as the accommodation of the canal boats and barges may render that necessary, and by omitting to provide for any interference with other ships and vessels in this respect under any other circumstances, by a well settled rule of construction, excludes the exercise of any such authority over them. The officers are authorized to interfere in these two instances, and as no others are enumerated, it necessarily follows that all others were intended to be excluded.

In construing laws, it is the duty of courts to render all parts of them efficient and operative wherever that can reasonably be accomplished. And it can only be done in this instance by giving the construction already mentioned to the act in controversy.

By giving it this construction, it will sanction no such exclusive appropriation of this part of the harbor, as will necessarily exclude all other ships and vessels from making use of it. But while it will, as it was the apparent intention of the legislature that it should, secure to canal boats and barges, and the lighters employed by them, a paramount right or preference to the use and occupancy of this part of the harbor, it will only exclude other ships and vessels from it, during the time that it may be required for that purpose, and will only sanction their removal when the positions occupied by them may be necessary for the accommodation of some canal boat or barge. When the necessity for such a removal arises, the law declares that it shall be made forthwith. And if this term is to

Roosevelt *v.* Godard.

have its full popular signification as it is here used, it would require that to be done *instanter*. But as laws are always to be construed reasonably, having reference to the subject to which they may relate, that could hardly have been the intention which the legislature intended to convey by the use of this term. Such a construction would sanction acts of harshness and injustice, which it could not have been the design of the legislature to countenance or permit. And if it was not, then all that could have been intended by the use of this term in this instance, was that the removal should be expeditiously and diligently made, without unnecessarily injuring, disturbing or deranging the business in which the ship or vessel to be removed was for the time being engaged. In other words, it could not have been the design in using this term, that a ship or vessel should at once be removed from its berth, when it should be found to be diligently and necessarily engaged in receiving or delivering its cargo. For, as such a removal would be both unjust and oppressive, the intention to effect it by the instrumentality of the law cannot with any thing like legal propriety, be attributed to the authority that enacted it.

This statute relates to the same subject matter which was included within the act of 1862. And in these respects it has provided different rules and regulations for the government of that subject. They are less restricted than those prescribed by the act of 1862. In that respect it is entirely inconsistent with that act, and so far must necessarily work its repeal by way of implication. The conflict between them is so direct and decided that they cannot be maintained and enforced together. It is impossible to appropriate this part of the harbor to the exclusive use of canal boats and barges, as declared by the act of 1852, and still permit it to be used by other ships and vessels, when neither used nor needed by the former, as it is clearly implied that it may be by the act of 1867. And

for that reason the later act must be deemed to have removed the absolute restriction imposed by the former one.

By giving the effect already indicated to the act of 1867, it constitutes a mere police regulation of the business of the harbor, which can neither be regarded as unjust or unreasonable. Legislation of this nature does not deprive the owners of the wharves to which it relates of any of their rights or privileges. It merely regulates the manner in which they are to be used and enjoyed for the purpose of promoting the business, security and good order of the harbor. It does not deprive the owner of his property, nor subject it to new uses, neither does it prevent him from devoting it to the lawful uses and purposes for which it has been adapted and designed. But it merely prescribes the manner in which those uses and purposes are to be subserved by it. And when that is all that may be accomplished by the law, it cannot be properly maintained that the owner has been in any essential respect either deprived of his property, or of the beneficial use or enjoyment of it. The uses to which property of this description are applied, though for the private gain of the owner, are public in their nature, and as such peculiarly subject to the regulations prescribed for them by the legislature.

The profitable use of it may in this manner be to some extent incidentally impaired, but that of itself is not sufficient to justify courts of justice in declaring that the law, through whose instrumentality that result may be produced, is void by reason of its conflict with the constitution. That instrument contains no provision which was calculated to restrain and prevent legislation of this nature, where it is not extended so far as either to deprive the owner of his property or of some essential beneficial use or enjoyment of it. And as the acts in controversy have been construed, they can in no just sense be regarded as productive of any such result. In this respect they are no more prejudicial to the proprietary rights and privileges of

the plaintiffs, than other similar laws which have been heretofore enacted and maintained.

In discussing the right of the legislature to enact laws of this nature in the case of *The Commonwealth* v. *Alger*, (7 *Cush.* 53,) Shaw, Ch. J. used the following language: "All property in this commonwealth, as well that in the interior as that bordering on tide water, is derived directly or indirectly from the government and held subject to those regulations which are necessary to the common good and general welfare. Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law, as the legislature under the governing and controlling power vested in them by the constitution, may think necessary and expedient." The cases of *Seward* v. *Beach*, (29 *Barb.* 239;) *Smith* v. *Turner*, 7 *How. U. S.* 283, 406;) *Com.* v. *Tewksbury*, (11 *Metc.* 55;) *Mayor*, &c. v. *Lord*, (17 *Wend.* 285, 290;) *Russell* v. *Mayor of New York*, (2 *Denio*, 461, 478, 479;) *Sorocco* v. *Gray*, (3 *Cal.* 69;) *Kean* v. *Rice*, (12 *Sergt. & R.* 203;) *Smith* v. *Levinus*, (4 *Seld.* 472;) will furnish illustrations of the use of this authority. Upon the particular subject of these harbor regulations, Woodworth, J. in deciding the case of *Vanderbilt* v. *Adams*, (7 *Cowen*, 348,) remarked as follows: "It seems to me that the power exercised in this case is essentially necessary for the purpose of protecting the rights of all concerned. It is not, in the legitimate sense of the term, a violation of any right, but the exercise of a power indispensably necessary where an extensive commerce is carried on. If the harbor is crowded with vessels arriving daily from various ports, the power is incident to such a state of things. Disorder and confusion would be the consequence if there was no control." "Police regulations are legal and binding because for the general benefit, and do not proceed to the length of impairing any right in the

Roosevelt *v.* Godard.

proper sense of that term." (*Id.* 351.) And Chief Justice Taney, in delivering the opinion of the Supreme Court of the United States in the case of *The James Gray* v. *The John Fraser*, (21 *How.* 187,) assumed the existence of this power in still broader terms, He said that : "Regulations of this kind are necessary and indispensable in every commercial port for the convenience and safety of commerce. And the local authorities have a right to prescribe at what wharf a vessel may lie, and how long she may remain there, when she may unload or take on board particular cargoes, where she may anchor in the harbor, and for what time, and what description of light she shall display at night, to warn the passing vessels of her position, and that she is at anchor and not under sail. They are like to the local usages of navigation in different ports, and every vessel, from whatever part of the world she may come, is bound to take notice of them and conform to them."

These principles are sufficiently broad and comprehensive to include and maintain the laws involved in controversy in this case, as those laws have been defined and construed. The order of the special term overruling the demurrer should therefore be reversed. And judgment should be directed for the defendants with costs, with the usual leave to the plaintiffs to amend in twenty days, in case they shall elect to avail themselves of that privilege.

[NEW YORK GENERAL TERM, November 2, 1868. *Peckham, Daniels* and *Mullin*, Justices.]