## THE VIOLETTA.

(District Court, S. D. New York. November 3, 1905.)

**1. COLLISION—TOW DRIFTING AGAINST BARGE ENGAGED IN ANCHORING—ABSENCE OF LOOKOUTS.**

A barge laden with coal, which had been cast off from a tow off Weehawken, and was attempting to anchor at or near the limits of the anchorage ground, was struck and sunk by one of three mud scows in tow of a tug on a hawser, which had just started from a point near by bound for the sea, and which, while the tug was working to the middle of the river, drifted down upon the barge. Neither the tug nor barge had an efficient lookout, and neither observed the other in time to avoid the collision, which might have been done by either by beginning in time. *Held*, that the absence of such lookouts was the proximate cause of the collision, and that both tug and barge were in fault.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, §§ 79, 149.]

**2. SAME—FAULT OF TUG—LIABILITY OF TOW.**

A tow which is without power and passively in control of a tug, and which was not chargeable with any negligence contributing to a collision between it and another vessel, cannot be held liable with the tug therefor, on the theory that the entire tow constitutes one vessel.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, §§ 72, 245.]

In Admiralty. Suit for collision.

Butler, Notman & Mynderse, for libellants.
Benedict & Benedict, for claimants.

ADAMS, District Judge. This action was brought by Jesse L. Eddy and others, the owners of the barge Thomas L. Parker, to recover the damages sustained by them through a collision between the barge and one or more of three mud scows, being towed by the tug Violetta from a point off Weehawken, New Jersey, and bound for sea. The Parker loaded with coal, was towed down the river from Cornwall, on the 17th day of December, 1902, by the tug Edwin H. Meade bound for Providence, Rhode Island. She reached a point off Weehawken the 18th and anchored in the vicinity of the Violetta's starting place while the Meade went to deliver the other vessels in the tow in New York. The Violetta made up a tow of 3 scows tandem on a hawser of about 150 feet in length and in proceeding to obtain a desired position in the river brought one of the scows violently in contact with the stem of the Parker, which, in a few minutes caused her to sink in such a depth of water that she was completely submerged and large damages, said to be about $25,000, resulted.

The Parker was a 3 masted coal barge in good condition, equipped with steam machinery for hauling the anchor and working the pump. She was 186 feet long and 23 feet wide, manned with a master, an engineer and a deck hand. At Cornwall, she was placed in the hawser tier of the Meade's tow on the starboard side and had several lines running to three boats in the tow, two on her port side and one behind. When the vicinity off Weehawken was reached, the Meade cast her off, with instructions to anchor until she should call for

her a little later. This the Parker proceeded to do, intending to put out about 40 fathoms but the tide was so strong, that she would not hold with that length and a greater scope, about 60 fathoms, was given but still she dragged and finally all of her chain, 75 fathoms, went out, when she held.

One of the questions in the case, is where she brought up. The libellants contend that she was still on anchorage ground while the claimants insist that she went entirely below the southerly limit thereof and is not entitled to any rights by reason of being on anchorage ground. A great deal of testimony has been taken upon this subject. A number of libellants' witnesses have placed the collision within anchorage boundaries, while the claimants put it below. It seems that the Parker cast her anchor when she was wholly within the limits and doubtless if it had held when the compressor was put upon the chain at 40 fathoms, she would have remained there, but the dragging carried her down so that when she brought up and held, she was probably below the southern limit of that section and the collision took place outside of the anchorage ground.

The Violetta's account of the affair is that she started from a point about 1900 feet above the collision. She intended to get out in the channel as soon as practicable and at first took a course of N. E. and varied it to N. E. by E. and veered around to S. E. under a gradual port helm. When she had gone part of the distance, moving out from shore but drifting down the river with the tide, her master at the wheel saw the barge, headed towards New Jersey and sagging down with the tide, and some 400 or 500 feet below him. The tug at this time was proceeding at full speed. The master saw the barge then swing to her anchor, and her anchor chain straighten up, when he headed more for New York and gave another bell for some extra speed which had been kept in reserve; he then saw the anchor chain come up again and the barge head more to the northward; he got by with the tug and two scows and the third scow collided with the bow of the barge. The tug was then from 200 to 250 feet across the barge, when he saw the starboard corner of the third scow strike the starboard bow of the barge, causing a parting of the lines between that scow and the others, immediately ahead, and the swinging around of the scow adrift on the port side of the barge.

The barge contends that she had been riding at anchor some 25 minutes before the collision, and the tug that the collision occurred while the barge was swinging to her anchor. It is probable that about the time the barge was swung out of the tow preparatory to anchoring, the tug had made up her tow and got started before the Parker held, but neither saw the movements of the other until a collision was imminent and it was too late to avoid it. The members of the crew of the barge were fully occupied in her manœuvres and the master of the tug, who was also acting as lookout in the absence of a person charged with that duty, did not see what the barge was going to do, nor indeed see her at all until the collision was imminent. He acknowledged that his eyesight was not very good and it was therefore particularly incumbent upon him to have aid in such

respect. Each side charges the other, inter alia, with the absence of a good lookout and the evidence sustains the allegations. It is shown that there was ample time while the Parker was getting out her anchor and swinging to it for the Violetta to have seen what she was about to do, especially as her movements would have shown a vigilant lookout that she was intending to anchor and the necessity for precautions on the tug's part in the 2 or 3 minutes that elapsed between her starting and the collision, which could easily have been avoided by a continuance of the course which the tug pursued until she changed to the southward. Likewise there was abundant opportunity for the Parker to have avoided the collision by refraining from anchoring for a short time, which she doubtless would have done, if she had seen the tug and tow a couple of minutes sooner. This lack of lookout seems to have been the proximate cause of the collision and both vessels should be condemned therefor.

Another question is whether the tow or any part of it should be held with the Violetta. It is urged by the libellants that the whole tow constituted one vessel and all should be condemned. Where proceedings are brought in rem, resort must be had to the actions of all the vessels to fix the faults of collision. The scows here were merely passive instruments of the tug and not implicated in the fault found against her. The authorities are opposed to holding the tow in such a case. In Sturgis v. Boyer et al., 24 How. 110, 16 L. Ed. 591, it was said (page 124 of 24 How., 16 L. Ed. 591) that the mere fact that one vessel strikes and damages another does not, of itself, make her liable for the injury, but the collision must, in some degree, be occasioned by her fault. In discussing the question of the liability of a tow in that case, it was said (pages 121–123 of 24 How., 16 L. Ed. 591):

"Cases arise, undoubtedly, when both the tow and the tug are jointly liable for the consequences of a collision; as when those in charge of the respective vessels jointly participate in their control and management, and the master or crew of both vessels are either deficient in skill, omit to take due care, or are guilty of negligence in their navigation. Other cases may well be imagined when the tow alone would be responsible; as when the tug is employed by the master or owners of the tow as the mere motive power to propel their vessels from one point to another, and both vessels are exclusively under the control, direction, and management, of the master and crew of the tow. Fault in that state of the case cannot be imputed to the tug, provided she was properly equipped and seaworthy for the business in which she was engaged; and if she was the property of third persons, her owners cannot be held responsible for the want of skill, negligence, or mismanagement of the master and crew of the other vessel, for the reason that they are not the agents of the owners of the tug, and her owners in the case supposed do not sustain towards those intrusted with the navigation of the vessel the relation of the principal. But whenever the tug, under the charge of her own master and crew, and in the usual and ordinary course of such an employment, undertakes to transport another vessel, which, for the time being, has neither her master nor crew on board, from one point to another, over waters where such accessory motive power is necessary or usually employed, she must be held responsible for the proper navigation of both vessels; and third persons suffering damage through the fault of those in charge of the vessel must, under such circumstances, look to the tug, her master or owners, for the recompense which they are entitled to claim for any injuries that vessels or cargo may receive by such means. As·

suming that the tug is a suitable vessel, properly manned and equipped for the undertaking, so that no degree of negligence can attach to the owners of the tow, on the ground that the motive power employed by them was in an unseaworthy condition, and the tow, under the circumstances supposed, is no more responsible for the consequences of a collision than so much freight; and it is not perceived that it can make any difference in that behalf, that a part, or even the whole of the officers and crew of the tow are on board, provided it clearly appears that the tug was a seaworthy vessel, properly manned and equipped for the enterprise, and from the nature of the undertaking, and the usual course of conducting it, the master and crew of the tow were not expected to participate in the navigation of the vessel, and were not guilty of any negligence or omission of duty by refraining from such participation. Vessels engaged in commerce are held liable for damage occasioned by collision, on account of the complicity, direct or indirect, of their owners, or the negligence, want of care, or skill on the part of those employed in their navigation. Owners appoint the master and employ the crew, and consequently are held responsible for their conduct in the management of the vessel. Whenever, therefore, a culpable fault is committed, whereby a collision ensues, that fault is imputed to the owners, and the vessel is just as much liable for the consequences as if it had been committed by the owner himself. No such consequences follow, however, when the person committing the fault does not, in fact, or by implication of law, stand in the relation of agent to the owners. Unless the owner and the person or persons in charge of the vessel in some way sustain towards each other the relation of principal and agent, the injured party cannot have his remedy against the colliding vessel. By employing a tug to transport their vessel from one point to another, the owners of the tow do not necessarily constitute the master and crew of the tug their agents in performing the service. They neither appoint the master of the tug, or ship the crew; nor can they displace either the one or the other. Their contract for the service, even though it was negotiated with the master, is, in legal contemplation, made with the owners of the vessel, and the master of the tug, notwithstanding the contract was negotiated with him, continues to be the agent of the owners of his own vessel, and they are responsible for his acts in her navigation. Sproul v. Hemmingway, 14 Pick. 1 [25 Am. Dec. 350]; 1 Pars. Mar. L., 208. The Brig James Gray v. The John Frazer et al., 21 How. 184 [16 L. Ed. 106]."

In the case of The Doris Eckhoff, 50 Fed. 134, 1 C. C. A. 494, in this circuit, it was held that a schooner in tow of a tug in the East River was not partly liable for a fault committed by the towing tug in failing to navigate in the middle of the river, as required by state statute. The court said (pages 136, 137, of 50 Fed., page 496 of 1 C. C. A.):

"So far as the proper navigation of the tow itself is concerned, the law is abundantly settled that she is bound to follow the guidance of the tug, to keep in her wake, and conform to her directions. The Margaret, 94 U. S. 494, 24 L. Ed. 146. This the schooner did. The district judge, however, held that the master and crew of the schooner were participating in the navigation, and in fault for not controlling the movements of the tug to the extent of requiring her to proceed in mid-river, either by ordering her to do so, or by endeavoring to swing her over in that direction by altering the helm of the Flint irrespective of the heading of the tug; that there was 'at least an acquiescence on the part of the master of the schooner in the illegal course taken by the tug;' and that as he was present, with his crew on board, steering after the tug, he must be held to have participated in the navigation of that course. We do not find that this proposition is supported by the authorities. The tug was, in fact, under the command and direction of her own master, and received no orders or direction from those on the Flint. On the contrary, those on the tow received and obeyed orders from the tug. We are unable to distinguish this case from that of The John Fraser, 21 How. 184, 16 L. Ed. 106. In that case the Fraser was in tow of

the steamboat General Clinch, which navigated with her into such dangerous proximity to an anchored vessel that, upon casting off her hawser, the Fraser was unable to avoid collision. Although she had her master and crew on board, and was attending to her own helm, she was not held to be participating in the navigation. The court said:

'According to the usage of trade at that port, she engaged a steamboat, well acquainted with the harbor and its usages, to bring her in. * * * The General Clinch was * * * under the command and direction of her own pilot. * * * She could select her own course and her own rate of speed. * * * When fastened to the hawser, and in tow, the Fraser was controlled entirely by the steam tug, both as to her course and speed. The steamboat was not subject to the orders of the commander of the John Fraser, but was altogether under the direction and control of her own commander. * * * The Fraser could do nothing more than watch the motions of the steamboat, and use her own rudder, so as to keep as nearly as might be in the wake of the tug to which she was attached.'

—And held that the collision was not caused by any fault or negligence on the part of the Fraser, and that she was not answerable for the consequences of the improper navigation of the Clinch. We do not find any qualification of the rule laid down in this case in any subsequent decision."

There is no suggestion here that the navigation of the Parker after she was cast off by the Meade, was in any way the result of negligence on the part of the latter as in The John Fraser, 21 How. 184, 16 L. Ed. 106, and she must be held to have been a participant in the negligence which produced the loss.

There will be a decree for the libellants for half damages against the Violetta, with an order of reference. The libel as to the tow will be dismissed.