### In re HUMBOLDT LUMBER MANUF'RS' ASS'N.

(District Court, N. D. California. February 21, 1894.)

No. 9,162.

1. DEATH BY WRONGFUL ACT—JURISDICTION—HIGH SEAS.

Code Civ. Proc. Cal. § 377, provides that, where the death of a person is caused by the wrongful act of another, the heirs or personal representatives of the deceased may maintain an action for damages against the person so causing the death. The constitution and Political Code of California fix the western boundary of the state, and of its counties, on the Pacific ocean, three miles west of the shore line. *Held*, that the territorial jurisdiction of the state extends over this three-mile belt, and such section 377 gives a right of action for wrongful death occurring on the high seas two miles from the shore.

2. ADMIRALTY—LIMITING LIABILITY—DEATH BY WRONGFUL ACT.

The death of a person was caused by the capsizing of a schooner two miles from the shore line of Humboldt county, Cal. The crew were drowned, and the personal representatives of some of them brought actions in the state court against the owners of the tug which had the schooner in tow at the time of the accident. *Held*, that the adm'ralty court for the proper district has jurisdiction to stay such actions, to de-

termine the liability of such owners under the limitation of liability act, and to enforce the rights that accrued to such representatives under the laws of California by reason of the acts complained of.

**3.** SAME—NEGLIGENCE—EVIDENCE.

The schooner Fidelity, in tow of the tug Printer, was capsized while crossing Humboldt bar, and all hands drowned. This bar is so shifting, and the channel in consequence so uncertain and dangerous, that it cannot be navigated without a skillful pilot. At the time of the accident the tide was strong ebb, running four knots or more an hour, and there was an adverse wind, blowing about nine knots, which was strong enough to back the ebb tide. The bar was extremely rough, the sea breaking in six or seven fathoms of water. The captain and mate of the tug testified that the schooner was capsized by an unexpectedly heavy swell, because she had no ballast, but they did not pretend to have discovered this when they took her in tow; and she had made a voyage of 500 miles before reaching the bar, in a stormy season. A number of pilots and seafaring men testified that the condition of the bar at the time made it unsafe to attempt to tow across it, and the lifeboat was unable to reach the capsized vessel. *Held*, that the accident was due to gross and inexcusable negligence on the part of the master of the tug.

**4.** SAME—LIMITING LIABILITY—PRIVITY OF OWNER.

On a libel for damages, the question whether there was not such privity between the owner and the master in the negligence of the latter as to take the case out of the provisions of the limited liability act will not be considered when the amount of damages proved is less than the stipulated value of the vessel.

**5.** SAME—MEASURE OF DAMAGES.

Under Code Civ. Proc. Cal. § 377, which provides that for the death of a person by the wrongful act of another "such damages may be given as under all the circumstances of the case may be just," $7,000 is just compensation for the death of a shipmaster, aged 35 years, whose wages were $100 per month, and who left a widow and two children; and $5,000 for the death of a ship's cook, aged 39 years, who received $50 per month, and left a widow and three children.

In Admiralty. Petition of the Humboldt Lumber Manufacturers' Association, charterer of the steam tug Printer, for limitation of liability under sections 4282–4289, Rev. St. U. S. Claims interposed by Olivia Christopherson et al. and by Mathilda O. Pederson et al. for loss of life, and by George W. Rager et al., part owners of 9-32 of the schooner Fidelity, for the loss of said vessel, alleged to have been caused by the gross negligence and unskillfulness of the master of the steam tug Printer, in towing the Fidelity over Humboldt bar on November 16, 1889.

S. M. Buck and Milton Andros, for petitioner.

J. N. Gillett, L. M. Burnell, Henry L. Ford, II. W. Bradley, and J. F. Coonan, for respondent.

MORROW, District Judge. On the 16th day of November, 1889, the schooner Fidelity, while being towed from the Pacific ocean into Humboldt bay by the steam tug Printer, was capsized on Humboldt bar. The captain and all hands on board the schooner were drowned, and the vessel itself drifted away, and became a total loss. On March 17, 1890, the Humboldt Lumber Manufacturers' Association, charterer of the steam tug Printer, filed a petition in this court, setting forth the loss of the schooner Fidelity, and alleging

that three separate actions had been commenced against the petitioner in the superior court of Humboldt county by persons claiming damages aggregating $75,000, charged to have accrued to plaintiffs by reason of the loss of the lives of the master and two of the employes of the schooner Fidelity. Petitioner also alleged that it was informed and believed that other persons would claim damages for the loss of life and property in said disaster, and that it desired to contest its liability, and the liability of the steam tug Printer, for the loss of the schooner Fidelity, her cargo, master, and crew, and also to claim the benefit of the limitation of petitioner's liability under the provisions of sections 4282--4289, inclusive, of the Revised Statutes of the United States. Thereupon an order was entered by the court citing all persons who had suffered any loss or damage by reason of the loss of the schooner Fidelity to show cause why an appraisement of the tug Printer should not be made, and why the petitioner should not have such other and further relief in the premises as might be meet and proper, and, in the mean time, all persons who had brought suits against the petitioner were restrained and enjoined from the prosecution of the same, as were also the commencement and prosecution of all and any suits against the petitioner as owner or charterer of the steam tug Printer, and in rem against the steam tug Printer, for and on account of any loss or damage arising from the loss of the schooner Fidelity. On May 1, 1890, Henry Wolf, an administrator of the estate of one who had perished by reason of the disaster, and who, prior to the filing of the petition in this case, had commenced a suit in the state court for damages accruing to the estate by reason of such loss, filed his answer and exceptions to the petition of the Humboldt Lumber Manufacturers' Association, denying, in effect, the jurisdiction of this court, and claiming, further, that, if the court had jurisdiction, the petitioner was not entitled to the benefit of the limited liability act, because the tug Printer, as he alleged, was not engaged in interstate commerce, and therefore was not subject to the national, but to the local or state, law. The questions raised were argued before the late Judge Hoffman, and, on the 7th of May, 1890, the answer and exceptions were overruled. On July 29, 1890, the matter was referred to Southard Hoffman, to appraise the value of the tug Printer, and such proceedings were thereafter had that on August 22, 1890, the commissioner filed his report, appraising the value of the tug at $22,500, which appraisement was confirmed by the court on September 5, 1890. On October 6, 1890, an admiralty stipulation in the sum of $22,500 was given and filed. On October 7, 1890, an order was made and filed that a monition issue against certain persons therein designated, "and against all persons claiming damages for any loss, destruction, damage, or injury suffered by them or any of them, or suffered by any decedent represented by them or any of them, by reason of the loss and destruction of said schooner Fidelity," citing them to appear before the court and make due proof of their respective claims on or before February 3, 1891. The monition was issued, published, and served as directed by the court, and returned and

filed on January 3, 1891. February 2, 1891, the following answers and claims were filed: Claim of Olivia Christopherson et al., damages for causing death of Capt. L. H. Christopherson, who was on the schooner Fidelity when she capsized, and was then drowned, $25,000. Claim of Mathilda O. Pederson et al., damages for causing death of Hans. C. Pederson in like manner, $25,000. Also, claims of part owners in the schooner Fidelity, as follows: George W. Rager, 1-16, $1,200; William Wallace, 1-16, $1,200; William F. McDaniels, 1-16, $1,200; Henry Axton, 1-16, $1,200; J. W. Freese, 1-32, $600. No claims were filed by the other part owners, and no explanation is furnished why they have failed to do so.

The case having been tried upon the merits and submitted upon briefs, it is now before the court for determination on the questions of jurisdiction and the liability of the petitioner for whatever damages may have been sustained by respondents by reason of the disaster. In the case of The Harrisburg, 119 U. S. 199, 7 Sup. Ct. 140, it was held that, in the absence of an act of congress or a state statute giving a right of action therefor, a suit in admiralty could not be maintained to recover damages for the death of a human being caused by negligence. The right of action in this case is claimed under the state law. The Code of Civil Procedure of this state provides as follows (section 377):

"When the death of a person, not being a minor, is caused by the wrongful act or neglect of another, his heirs or personal representatives may maintain an action for damages against the person causing the death, or if such person be employed by another person who is responsible for his conduct, then also against such other person. In every action under this and the preceding section, such damages may be given as under all the circumstances of the case may be just."

The petitioner claims that in this case the alleged negligent act was on the high seas off the coast of California, and without the limits of any county of the state. The evidence shows that the place of disaster was on Humboldt bar, off the entrance to Humboldt bay. The master and mate of the tug Printer testify that they had nearly cleared the bar, were on one of the last swells, when an unusually and unexpectedly large swell suddenly arose behind the Fidelity, and lifted her stern out of the water, and she capsized. The master fixes the place of the catastrophe as "just inside the bar, about two miles off the entrance to Humboldt bay, on the Pacific ocean." Flaherty, employed at the life-saving station on North spit, Humboldt bay, which is in full view of the bar, fixes the distance from where the Fidelity capsized to the ocean shore at one mile and a quarter or a mile and a half. Robert Hennig, keeper of the life-saving station at Humboldt bay, says that the station is right in plain sight of the bar, and fixes the distance in a direct line from the station to the bar at one mile and a half or two miles.

From this testimony I find as a fact that the schooner Fidelity capsized on Humboldt bar; that the vessel was inward bound, and at the time was opposite to the entrance to Humboldt bay, and at a point not greater than two miles from the shore. The disaster occurred on the high seas, within the admiralty and maritime juris-

diction of the United States. Did it also occur within the territorial limits of the state of California?

In article 21 of the constitution of the state of California, the boundary of the state along the Pacific ocean is described as follows (section 1): "* * * thence running west and along said boundary line to the Pacific ocean, and extending therein three English miles; thence running in a northwesterly direction and following the direction of the Pacific coast to the forty-second degree of north latitude." Section 33 of the Political Code of the state fixes the territorial jurisdiction of the state as follows: "The sovereignty and jurisdiction of this state extends to all places within its boundaries as established by the constitution, * * *." The shore boundary of Humboldt county, as provided in section 3914 of the Political Code, is as follows: "* * * thence west, on said line, to the Pacific ocean; thence northerly, along the ocean shore, to the place of beginning." In section 3907 of the same Code, it is provided as follows: "The words 'in,' 'to,' or 'from' the ocean shore mean a point three miles from shore. The words 'along,' 'with,' 'by,' or 'on' the ocean shore mean on a line parallel with and three miles from shore." What is the effect of such constitutional and legislative provisions respecting the rights of parties, under the laws of the state, where the shore limits of the state are thus involved? In Wheaton's International Law (section 177) the maritime territorial jurisdiction of an independent nation is defined as follows:

"The maritime territory of every state extends to the ports, harbors, bays, mouths of rivers, and adjacent parts of the sea inclosed by headlands, belonging to the same state. The general usage of nations superadds to this extent of territorial jurisdiction a distance of a marine league, or as far as a cannon shot will reach from the shore, along all the coasts of the state. Within these limits, its rights of property and territorial jurisdiction are absolute, and exclude those of every other nation."

In Manchester v. Massachusetts, 139 U. S. 264, 11 Sup. Ct. 559, it was held, under a state statute similar to that of California, that:

"The extent of the territorial jurisdiction of Massachusetts over the sea adjacent to its coast is that of an independent nation; and, except so far as any right of control over this territory has been granted to the United States, this control remains with the state."

The court say further:

"Within what are generally recognized as the territorial limits of states by the law of nations, a state can define its boundaries on the sea and the boundaries of its counties."

This authority clearly establishes the validity of the constitutional and legislative provisions of the state of California fixing her boundary, and that of Humboldt county, along the Pacific ocean at a distance of three English miles from the shore. To this boundary extends the jurisdiction of the state. U. S. v. Bevans, 3 Wheat. 336. But does it follow that the laws of the state can create a liability in a marine case arising on the high seas within such boundary? In the case of Butler v. Steamship Co., 130 U. S. 527, 9 Sup. Ct. 612, Mr. Justice Bradley suggested a doubt upon this question, but expressed no opinion. In the case of The Corsair, 145 U. S. 335, 12

Sup. Ct. 949, this doubt was in a measure removed. But in the recent case of The City of Norwalk, 55 Fed. 99, Judge Brown, of the southern district of New York, reviews this question in an elaborate opinion, in which he points out that in Steamboat Co. v. Chase, 16 Wall. 522, and in Sherlock v. Alling, 93 U. S. 99, the supreme court had substantially decided the question in favor of the authority of the state to create a liability of this character. He further determines that this liability may be enforced in admiralty by a libel in personam. The opinion contains a full discussion of the question in all its bearings, and the conclusion reached is supported by abundant authority. The case at bar is in the nature of proceedings in personam. The petitioner was being prosecuted in the state court for the loss of life and property. It has brought all these cases here, and asks this court to determine its liability by virtue of the limited liability act and the rules of the supreme court thereunder. The fact that it also seeks to limit its liability to the value of the tug employed in the service out of which the liability is charged to have arisen does not change the form or character of the action.

It has been further urged, as a ground for applying to this case the law of this state, that the petitioner was a corporation organized and existing under the laws of the state; that the persons who lost their lives in the disaster, and for whose death claims have been presented, were residents of California; that the tug Printer was registered at the customhouse at San Francisco, and that the Fidelity was enrolled and licensed at the customhouse at Eureka, Cal. None of these facts except the last appear to have any jurisdictional significance. In Shearman & Redfield on Negligence (paragraphs 124–140) the law relating to the remedy for injuries causing death is discussed. In paragraph 131 it is said that:

"It makes no difference in this respect that both parties to the injury were citizens of the state by which the statute was enacted, or that the wrongdoer was a corporation chartered by that state, or that the negligence causing the injury was a breach of a contract entered into in that state, or that the decedent was brought into the state while living, except in Michigan. But, if the accident happened upon a vessel at sea, the statutory action will lie if the vessel was at the time within the maritime jurisdiction of the state enacting the statute, or if the vessel was owned and duly registered there."

I am of the opinion that this court has jurisdiction to determine petitioner's liability in this case, and to enforce whatever rights may have accrued to the respondents under the provisions of the statute of the state; and I base this opinion chiefly on the fact that the vessel upon which the accident happened was, at the time, within the territorial jurisdiction of the state of California.

The Fidelity was a flat-bottomed schooner of light draught, built for the coasting trade. She was designed particularly for the lumber business, and her carrying capacity was in the neighborhood of 275,000 feet. She was constructed at Eureka, Cal., in 1881, at a cost of about $19,000, and was enrolled at the customhouse in Eureka. At the time of her loss she was in good repair and sailing trim, and her value at that time was about $12,000. For some

time prior to the disaster, she had been running regularly between Eureka and Santa Barbara; going down laden with a cargo of lumber, and returning in ballast. She usually carried about 20 tons of ballast. Her master was one L. H. Christopherson, who, at the time of the disaster, was making his second trip into Humboldt bay. The Printer is a steam tug of about 110 tons gross measurement (about 52 tons net). At the time of the loss of the schooner Fidelity, she was a new boat, or nearly so, being not quite a year old. She was well tackled and appareled, staunch and strong, and in thorough working order for the purposes of towing vessels to and from Humboldt bay. She was then under charter by the Humboldt Lumber Manufacturers' Association, and was commanded by Capt. R. J. Lawson. Humboldt bar, the place of the disaster, is off the entrance to Humboldt bay. It cannot be accurately described, because it was in 1889 undergoing almost constant changes. The entrance channel had been known to shift its course within 24 hours, and while its length might be at one time one-half a mile, at another period it might be a mile and a half, or more; while one day the passage would be tortuous, at another it would be almost straight. This was due to the almost incessant shifting of sand, and to the prevalency of shoals. For these reasons, the entrance was considered dangerous, and navigation over the bar and through the channel difficult and, at times, more or less hazardous. The dangers attending the passage over the bar depended, of course, in a great measure upon the state of the wind and tide and the incoming swells. But the evidence establishes the fact that an attempt to cross it and get into Humboldt bay was, to one unacquainted with its nature and peculiarities, and unassisted by a pilot, a reckless and daring undertaking, and reference is made in the testimony to attempts of a like character which had resulted in loss of both life and vessel. The ordinary dictates of prudence and of good seamanship would compel the invariable employment of an experienced and skillful pilot, one thoroughly conversant with the peculiarities of this bar, and ever on the alert to acquaint himself with its deflections, changes, and peculiar dangers. The witnesses all agree as to its dangerous character. Flaherty, of the life-saving station, says: "It is a very dangerous bar. * * * Shifting sand and shallow water." Bone, a bar pilot, says: "It is a rough bar, liable to change inside of twenty-four hours. * * * It is a dangerous bar, providing a man don't know his work." Buhne, a bar pilot of long experience, testifies that it is a dangerous bar, owing to shifting sands and shoals. Hansen, another bar pilot of long experience, says: "We sailors call it a treacherous bar." Smith, assistant United States engineer, says: "That year (1889) it was very shifting." The Pacific Coast Pilot, an official publication prepared and published by the United States coast and geodetic survey for the use of mariners, has this to say concerning Humboldt bar:

"Like the entrances to all the rivers and bays on this coast, this has a bar, which undergoes irregular changes, depending much upon the prevalence, direction, and strength of the wind and swell, upon the direction of

the ebb current through the entrance, and, doubtless, upon the volume of fresh water brought down by the streams entering the bay. The depth of water on the bar ranges from twelve to twenty-four feet at low water. The width, direction, and position of the bar vary irregularly. The north and south spits also cut away and re-form. From experiments made in 1854, we found the ebb current in the channel to run three miles per hour, with a maximum velocity of four and five miles between the north and south points of the entrance. Under the above varying conditions of the bar and channel, no sailing directions can be given, because changes may occur immediately after an examination. As the bar has always had the services of superior pilotage and towage, the best advice we can offer in regard to entering the bay is to wait for the pilot tug. When vessels are seen approaching the bar, a flag is hoisted on the flagstaff on Red bluff, and the tug goes out to tow them in; if the bar is heavy, and the tug cannot cross it, yet considers it safe for the vessel to cross, she lies close inside the bar, and sets a signal at the masthead for the vessel to run for. A stranger should not under any circumstances attempt to cross the bar without a pilot. There are several powerful tugs, with skillful pilots."

It is to be observed, however, that while the bar and channel are subject to these marked changes, and the entrance to the bay therefore shifting and dangerous under certain conditions, nevertheless a careful and skillful pilot, familiar with the locality and provided with a good tug, could, by selecting a proper state of wind and tide, tow a vessel either in or out of the bay without risk of disaster. The witness Bone, who had been on the bar 16 years, and for the last 5 years as a pilot, testifies that he never lost a vessel with a hawser on board. "This was the first time," he says, "that a vessel was lost with the hawser on board."

On the morning of the 16th day of November, 1889, at about 6 o'clock, the tugs Printer and Ranger, employed by the Humboldt Lumber Manufacturers' Association, and the tug H. H. Buhne, controlled by H. H. Buhne, who was running in opposition to the Humboldt Lumber Manufacturers' Association, proceeded from Eureka down to the entrance of Humboldt bay. The Printer was in command of R. J. Lawson; the Ranger, of one McKinnon; and the H. H. Buhne, of J. Hansen. The Printer and Ranger went down, intending to tow out two lumber-laden steam vessels, but they failed to make the attempt because, as the witness Tibbitts says, the bar was too rough. The tugs then gave their attention to crossing the bar, to tow in such vessels as might wish to come in. There is some testimony tending to show that the Ranger, in attempting to cross the bar that morning, at or near the entrance of the bay, was considerably damaged by shipping heavy seas, and was compelled to put back for Eureka. One man was lost from this tug on that occasion. This testimony was drawn from one of the petitioner's witnesses with some difficulty on cross-examination, in the face of objections. The H. H. Buhne, followed by the Printer, kept on, and crossed the bar between 7 and a quarter to 7. Both proceeded to look for vessels to tow in. A vessel was descried, which proved to be the Fidelity. The H. H. Buhne immediately made for her, but the services of this tug were declined, as, it seems, the schooner was required to take the Printer in preference to tugs of the opposition. Acting upon a suggestion from the captain of the schooner, the master of the Buhne proceeded northward in quest of a vessel, in the

expectation that his services might be required, and he did not return to Humboldt bar until between 2 and 3 in the afternoon. Meanwhile the Printer came up, for she followed very closely upon the wake of the Buhne, spoke the schooner, passed over the hawser, and thereupon proceeded to tow the Fidelity over the bar into the bay. At this point the facts attending the catastrophe become obscured by contradictions, and the credibility of the witnesses becomes important; and in this connection it may be well to observe that most of the witnesses for petitioner are not entirely disinterested, while those on behalf of the respondents appear to be without interest in the result. R. J. Lawson, the master of the tug on this occasion, certainly has interests at stake. His reputation as a competent navigator is directly involved, and to his gross carelessness, if not criminal negligence, the catastrophe has been attributed by the respondents; besides, the pecuniary interests of his employer are directly concerned. The only living eye-witnesses to the catastrophe who appeared and testified are Lawson and Johnson, respectively master and mate of the tug, and W. P. Smith, the assistant United States engineer, who was on the inside of, and very near, the entrance of the bay. One Pehrson, a steward on the tug Printer at the time of the capsizing, testifies to the condition of the bar at the time the tug started to tow the schooner over, but he was not asked whether he saw the schooner capsize, and he does not testify that he did.

Having determined that the schooner capsized on Humboldt bar, the next question to be examined, and that upon which the whole case hinges, is as to the condition of the bar at that time. And this, in turn, involves necessarily a consideration of the wind, tide, and swell. The respondents claim that the loss of the schooner and of those on board was caused and brought about solely by the gross carelessness and negligence of Capt. Lawson, as the servant of the Humboldt Lumber Manufacturers' Association, in towing in the schooner while the bar was in the condition in which it was on the 16th day of November, 1889, when the attempt was made. The petitioner, the Humboldt Lumber Manufacturers' Association, denies that the bar was in the state of roughness claimed by the respondents, but attributes the capsizing to a peril of the sea, in that, it alleges, an unusual and unexpected heavy swell lifted the stern of the schooner out of the water, and that she thereupon careened over. It further claims that the schooner was either not ballasted at all or insufficiently so, for, had she been properly ballasted, in its judgment she would have safely ridden the unexpected and heavy swell, which it terms a "peril of the sea." And, finally, it claims that, if Capt. Lawson was delinquent, it was not gross carelessness or negligence on his part, but simply an error of judgment, allowable under the circumstances, and, being in extremis, the law does not attach to such delinquency any pecuniary retribution. In this connection it may be observed that Capt. Lawson did not have a license from the pilot commissioners of Humboldt bay, as required by the laws of this state. He claims, however, to have had a license under the laws of the United States as master and pilot of tugboats

for the Pacific ocean and coastwise, issued by the United States inspectors. But it is urged by the respondents that this license was not sufficient; that, under sections 4285 and 4444 of the Revised Statutes of the United States, the regulation of pilot service at Humboldt bay was subject to the state law only; and it is contended that, as the tug Printer was in command of a person contrary to that law, there are no presumptions in favor of the tug or its master, but, on the contrary, it devolves upon the petitioner, under the circumstances, to prove that the misfortune was without negligence on the part of the pilot, and was unavoidable. Phillips v. The Sarah, 38 Fed. 252. It may not be necessary to resort to this rule in determining where the responsibility lies in this instance; nevertheless, the fact that the master of the tug was without the license required by the local law is a circumstance not, perhaps, without some significance in the case.

We will now proceed to consider the condition of the schooner Fidelity at the time the tug took her in tow. There is some testimony tending to show that the schooner usually carried about 20 tons of ballast, from which it may be inferred that she was so provided on this occasion. All hands on board having been lost, we are deprived of their testimony on this point; but, if she were not in sufficient ballast, is it likely that they would have undertaken the voyage of 500 miles from Santa Barbara to Humboldt bay at a season of the year when storms are not infrequent? It is true that both Capt. Lawson and Mate Johnson of the tug attribute the capsizing of the schooner to her total want, or insufficiency, of ballast. But their testimony is unsatisfactory in several particulars. Capt. Lawson swears that, in his opinion, the schooner could not have been properly ballasted. He bases this conclusion upon the fact that she did not settle back when her stern was lifted out of the water by the heavy swell. It was then, and only then, that he first noticed that she was either not ballasted at all, or insufficiently so. It is a peculiar fact that, as an experienced and skillful pilot, he should not have observed this condition of affairs when he took the vessel in tow. He testifies that they had very nearly crossed the bar, and yet, until the very time when she actually did capsize, he failed to observe either an insufficiency, or even a total absence, of ballast in the vessel. Is it not reasonable to suppose that, if the vessel were as he represents her to be, her movements would have betrayed her condition, and this before they had very nearly crossed the bar? Johnson, the mate of the tug, gives it as his opinion that the schooner was not properly ballasted, and he bases this judgment for the most part upon the assertion that, had she been properly ballasted, she would have survived the unusual and unexpected heavy swell to which reference has been made. But, if his testimony is carefully scrutinized, it will be found that he does not swear that he noticed, either before or at the time the schooner capsized, that she was insufficiently ballasted, or not at all. The captain testifies:

"As I was watching her, and saw her stern lifted out of the water by a big swell or wave, I expected her stern to settle back again as the wave came on, but I soon saw that she was acting like an empty vessel, without

ballast. She appeared to be as light as cork. There seemed to be nothing in her to hold her down. She seemed to be at the mercy of a swell which she ought safely to have ridden."

If this condition of things was so apparent to the captain, would not the mate have also observed this? The captain seeks to strengthen his theory by stating:

"Indeed, until after the loss of the Fidelity, and discovering that she had no ballast, or not sufficient, I did not learn that shipmasters running to Humboldt bay were accustomed to throw their ballast overboard while lying in the offing, awaiting the arrival of a tug to tow them into Humboldt bay."

But this testimony on the captain's part is confessedly mere hearsay, and it is strange that, if such were the custom of shipmasters, not one witness was called to substantiate that isolated statement. Such proof would have had the effect, if nothing more, of corroborating the captain in an important particular. Johnson, who testified to having been a mate of tugboats for six years, of which one year was spent on Humboldt bar, does not state that any such custom prevailed. It is curious that the captain himself, who had navigated the bar from July preceding, was not aware of this practice. Such testimony, while it may not be absolutely false, is calculated to create distrust in the credibility of a witness, especially when he is contradicted in other important and material particulars. It is obvious that the court cannot, upon such meager and unsatisfactory testimony, find that the capsizing of the schooner was due to either an entire absence, or to an insufficiency, of ballast.

We come now to the question as to the condition of the bar. The time at which the Fidelity capsized is variously fixed by the witnesses. They range all the way from about 8 o'clock to 9:30 of the morning of November 16, 1889. Lawson and Johnson do not fix accurately the time when the Fidelity capsized; the latter states that it was about 8 o'clock when they first crossed in, while the former would seem to imply from the context of his statements that it was about 8 o'clock when he first gave the Fidelity his hawser. All the other witnesses fix the time at from 9 to 9:30 o'clock. Flaherty puts it at 9:30, or thereabouts. Hennig says about 9:30. Nelson states it was some time from 9 to 9:30. Perhaps the most satisfactory witness is W. P. Smith, the assistant United States engineer, who saw the Fidelity capsize. He fixes the time at a little after 9, or a quarter past 9. He afterwards timed the life-saving employes in getting out their lifeboat, and thus had occasion to note particularly the time. Tibbitts was advised of the capsizing some time after 9 o'clock. The preponderance of testimony shows that she capsized after 9, and not, as Lawson and Johnson would seem to imply, before 9 or some time after 8 o'clock. It was probably about a quarter past 9. As to the condition of the tide, all the witnesses agree that it was an ebb tide. But as to when the tide turned that morning, or how long it had been ebbing at the time of the catastrophe, cannot be determined with accuracy. Capt. Lawson says: "The tide had turned about an hour before the Fidelity capsized, but there was no perceptible ebb of the tide at that time. It was what I would call high water slack." Johnson

says: "We left the dock at Eureka, Humboldt bay, at 6 o'clock a. m., and proceeded to sea. The bar at that time was in fair condition, about an hour and a half before high water." That would make high water at about 7:30. Flaherty testifies: "She capsized, I suppose, about half past 9. At that time the tide, I should say, had been ebbing about an hour and a half." That would make high water about 8 o'clock. Hennig also fixes high water at about 8 o'clock. Nelson says: "It was high tide about 8 o'clock in the morning, and it was about half past 9 o'clock when it happened. It was about an hour and a half; something like that." Hansen, in answer to the question, "Do you know at about what hour the tide began to ebb that morning?" said: "I think about 8 o'clock; somewhere about that; in the neighborhood of 8; maybe a little before,—between half past 7 and 8." These witnesses, and others to whom it is unnecessary to refer, fix high water at any time between half past 7 and 8 o'clock, or thereabouts. As against this testimony, that of W. P. Smith, the assistant United States engineer, who has local charge of improvements which the government has been making in the entrance to Humboldt bay, stands alone. He fixes higher water at exactly 7:05 a. m. This he does by means of a government tide gauge at the entrance of Humboldt bay. It is a self-registering tide gauge, run by clockwork. Smith testified to its being in perfect working order at that time. He says: "At 9 o'clock, the time the vessel went over, the tide had been running out two hours, and in that time it had fallen eight-tenths of a foot." He gives in his testimony what purports to be an accurate record, as shown by the United States official tide gauge, of the various phases of the tide on November 15th, 16th, and 17th. There is, therefore, all the way from a half an hour to an hour's difference between Smith's estimate and those of the other witnesses. Smith speaks from the record; the others testify from their opinions. Smith fixes it exactly and positively. The number of witnesses as against the record is immaterial; that fact alone does not impeach the accuracy of this United States official tide gauge. In view of the fact that no such glaring discrepancy which would arouse misgivings as to the accuracy of its registrations has been divulged, and no attempt made to show that on this occasion, or, in fact, on any occasion, it has erroneously registered when in perfect working order, and since Smith testifies that on the day in question it was in perfect working order, the court, in the absence of evidence to the contrary, feels compelled to recognize such record as more satisfactory and preferable to the more or less conjectural approximations of the witnesses. By the Pacific coast tide tables, published by the United States coast and geodetic survey, high water at Humboldt bay on the morning of November 16, 1889, occurred at 5:54 a. m. What elements may have interfered to set the tide back more than an hour, as indicated by the record of the official tide gauge, does not appear. The tide tables have not been referred to by either side, and will, therefore, not be considered now except in so far as they tend to show that high water on that morning did not occur later than the time shown by the tide gauge. Taking that record as true, it was high

water on November 16, 1889, at 7:05 o'clock a. m., and, assuming that the schooner capsized about 9 or a quarter past, the tide would have been running ebb about two hours, and, under the law of tidal currents, it was approaching its maximum velocity for that tide.

There is some conflict as to the actual speed at which the tide was running out. Some of the witnesses term it an ordinary tide; others, a swift tide. The former fix the speed at about two knots; the latter, at from four to seven knots an hour. Lawson says that the tide was high water slack. But this statement is plainly untrue, and requires no further comment. Johnson speaks of the tide as being favorable to tow in. Flaherty speaks of its being a strong ebb tide. "It was a rainy season, and a big freshet out of the water courses, which would strengthen the tide as it ran out." He concludes that "the tide was ebbing about seven miles an hour; down there at the entrance it must have ebbed about that." Hennig says, in answer to the question, "About how fast was the current running at the entrance there? A. Well, I should judge about four knots an hour; something like that; probably more, or perhaps a little less. It was a pretty swift current we had to contend with in returning." This witness had been out in the lifeboat from the life-saving station in an unsuccessful effort to reach the wreck. As to his knowledge of the current, he was asked: "Q. You found that out upon trying to go back? A. It was a long time, even after we got into smooth water and we had but the current to contend with, before we got around. There was quite a fresh breeze, and that was something against us, too. We had to pull considerable to make it." Hansen says that, if there was a two-foot fall from high to low tide, it would mean a current of about two knots. Smith, who was not on the bar, but in a small boat, coming towards the entrance along the inside of North spit, and about 100 yards from the shore, says: "It was ebb; what we call a small ebb." He says he could not tell the rate at which the current was running out at the time of the capsizing, but he states that it was very light. He does not know the rate of speed of the current on the bar, but approximates it at the entrance of the bay as about two miles an hour in the strongest current. He states that on the bar the current would not run as fast, but admits that he has never measured the strength of the current on the bar. On cross-examination, he admits that he was drifting in a small boat with the tide for the greater part of the distance. Admits that currents on the bar are very swift at times, but has never tested their strength. Also states that a southeast wind was blowing, and that that always backs the ebb tide. There is no direct evidence of the speed of the tide on the bar at the time of the capsizing. As to the rate on the inside, and at the entrance, of Humboldt bay, there is a conflict between Smith and the other witnesses. Flaherty, in saying that it ran seven miles an hour "down there at the entrance," simply made an assumption as to the probable force of the current on the bar, separated from it by a distance of about a mile and a half, and therefore his estimate should be taken with that qualification. Hennig fixes it as about four knots. This he bases upon the strength of the current encountered

in returning from the bar, which was some time after the vessel capsized. Smith, it should be remembered, did not get out of the entrance onto the bar, as Hennig did, but rode with the current for the most part, on the inside of the bay. The inconsistency between these last witnesses, discarding Lawson's uncorroborated statement as to its being high water slack, is probably reconcilable in view of the fact that all are approximations under somewhat different conditions. The tidal current was probably running out through the channel at the rate of about four knots an hour. On the bar the force of the current was perhaps somewhat less, but its exact velocity cannot be determined from the testimony.

M. Connell, an observer in the United States weather service, stationed at Eureka, gives the official record of the direction and velocity of the wind on November 16th, 1889, at Eureka, as six miles per hour from 8 to 9 o'clock a. m. and at eight miles from 9 to 10 o'clock. The direction of the wind varied from south to southeast. It was stipulated that from the city of Eureka to the bar, in a direct line, was about five miles. The witness admitted that on the ocean—on the bar—the wind might be a mile or two faster, which would make the velocity of the wind on the ocean about nine miles an hour. Lawson says: "A scarcely perceptible breeze was blowing from the south,—nearly a calm." This statement is so palpably false, in view of the testimony of the other witnesses, that it can be passed without further comment. Aside from Connell's official registrations, Hennig, speaking of the wind they had to contend with in returning from the bar, after futile attempts to go out to the drifting schooner, says: "There was quite a fresh breeze, and that was something against us." Smith states: "It was blowing a little from the southeast; not very heavy." Bone testifies that there was "quite a little wind." He judged so from his observations some four miles away from the bar. Flaherty, in response to the question, "What kind of a day was that?" said: "The wind was from the southeast; coming in about fifteen miles an hour, I suppose; kind of rainy,—not exactly rain, but drizzling." Fifteen miles an hour for about the time when the Fidelity capsized is undoubtedly a mistake. The wind did reach that velocity in the afternoon, and, as the question of the interrogator was rather general, the answer may be explained in that way. Taking Mr. Connell's official estimate, and allowing for an increase on the bar, a fair conclusion as to the velocity of the wind on the bar at 9:15 would be between eight and nine miles an hour. It was strong enough to back the ebb tide.

That the bar, with all these turbulent elements combined, was very rough, and dangerous for vessels to cross, on the morning in question, is established by the witnesses Flaherty, Hennig, and Nelson, of the life-saving station, who had occasion to know its character, and particularly to observe its condition at the time of the disaster, and for an hour or more after, while they were attempting to force their way with the lifeboat to the place on the bar where the schooner was then drifting. Flaherty testifies that there was a high sea running; about as high as he had seen it since he had been in the

service; that the bar was terribly rough. In speaking of their attempt to reach the wreck in the lifeboat, he says that they could not manage the lifeboat there; they tried to get out, but were driven back. Hennig testifies that the bar, on the day the Fidelity capsized, was as bad as he ever saw any bar anywhere. He judged that the sea was breaking in nine or ten fathoms of water. He never saw the bar rougher. He narrates the efforts made to reach the scene of the disaster, and the unsuccessful result because of the roughness of the bar, and he tells of the refusal of Capt. Lawson to tow the lifeboat out to where the Fidelity capsized, because the bar was too rough to cross. This witness had been a sailor, fisherman, and surfman all his life. Nelson testifies that it was a rough bar all that morning; the sea was breaking further out than he had ever seen it before or after. Pehrson, the steward on the tug Printer, testifies that the bar was rough by spells, and, when the Printer started to tow the Fidelity, he asked Capt. Lawson if he was going in, telling him that the bar was rough. The captain told the witness to mind his own business. Peter Bone, who observed the condition of the bar from a lookout at the Occidental mill, a distance of about four miles from the ocean shore, testifies that the sea was breaking in seven fathoms, and that it was too rough to tow a vessel in across the bar after the tide had been running ebb for an hour or an hour and a half. The witness Buhne explains the danger of these conditions to a light or ballasted vessel as follows:

"When you take a light vessel in on a heavy breaker, it is very dangerous, on account of the two forces working against each other. The heavy sea or breaker that rolls in forces your vessel in; and the ebb tide runs out, and draws the vessel out. Now, when your vessel runs in on the ebb tide, the breaker brings it in a certain distance, and then it falls off, and tumbles down by the nose. That nose strikes the ebb tide, and the heavy breaker forces your vessel ahead, and, consequently, it is just like a leverage. The strain goes one way, and the tide another way; and, if the sea is heavier than the tide,—has more power upon the vessel,—it will turn it over, capsize it, or 'pitchpole' the vessel, as we sailors call it."

The witnesses Flaherty, Bone, Hennig, Nelson, and Hansen express the same general view as to the danger of attempting to cross Humboldt bar with heavy seas rolling in against an ebb tide, and the lack of care and skill on the part of a pilot who makes such an effort. It will not be necessary to review this testimony in detail. It is sufficient to say that, taking it all together, and giving to the witnesses such consideration as their character, intelligence, situation, and opportunities for observation seem to justify, the conclusion is reached that at the time, and before and after the disaster, the bar was in an exceedingly dangerous condition, and that a careful and skillful pilot would not have attempted to tow the Fidelity over the bar under the conditions prevailing at that time. The master of the tug was bound to know the state of the sea, wind, and tide, and whether, under the circumstances, it was safe and proper to make the attempt to tow the schooner across the bar. His sufficient knowledge of the bar and its shifting dangers, and his skill as a navigator in avoiding or overcoming those perils, were precisely the character of services he assumed to offer when he proposed to take

the schooner in tow. Concerning the qualifications of pilots whose employment is to guide vessels in and out of ports, the supreme court, in Steamship Co. v. Joliffe, 2 Wall. 462, says: "For the proper performance of their duties, a thorough knowledge of the port in which they are employed is essential, with its channel, currents, and tides, and its bars, shoals, and rocks, and the various fluctuations and changes to which it is subject." Such being the law, how can Capt. Lawson excuse himself now by saying that he encountered a peril of the sea, or that the catastrophe was the result of an error of judgment while acting in extremis? He did indeed encounter a peril of the sea; but of what character? He says: "An unusual and unexpectedly large swell suddenly arose behind the Fidelity, and lifted her stern out of the water. * * * The swell that lifted her was one of those unexpected heavy seas the origin of which is some disturbance at a distant point of the ocean." Capt. Lawson may be correct in saying that this heavy swell had its origin at a distant point of the ocean, but that it was unexpected does not appear. It was not unexpected, and should not have been, to those who were familiar with the bar. Such is the testimony of a number of witnesses. To them, heavy seas rolling in against an ebb tide, and breaking in six or seven fathoms, was a sufficient warning of danger, and they did not consider it safe to tow in under such conditions. Capt. Lawson ignored the warning that was before his eyes, and deliberately plunged into a peril when it should have been avoided. The undertaking being reckless in its inception, nothing was left for the judgment to act upon in its prosecution. What induced him to take such a risk it is perhaps difficult to determine. It may have been the influence of the spirit of competition and rivalry in which the pilotage business was then involved at that port. In any event, his conduct was more than an error; it was a fault. The law of responsibility of a tug, in a somewhat similar situation, was declared by the supreme court, in the case of The Margaret, 94 U. S. 496, as follows:

"The tug was not a common carrier, and the law of that relation has no application here. She was not an insurer. The highest possible degree of skill and care were not required of her. She was bound to bring to the performance of the duty she assumed reasonable skill and care, and to exercise them in everything relating to the work until it was accomplished. The want of either in such cases is a gross fault, and the offender is liable to the extent of the full measure of the consequences. Brown v. Clegg, 63 Pa. St. 51; The Quickstep, 9 Wall. 665; Wooden v. Austin. 51 Barb. 9; Wells v. Navigation Co., 8 N. Y. 375; The New Philadelphia, 1 Black, 62; The Cayuga, 16 Wall. 177; Cushing v. Owners of John Fraser, 21 How. 184. The port of Racine was the home port of the tug. She was bound to know the channel, how to reach it, and whether, in the state of the wind and water, it was safe and proper to make the attempt to come in with her tow. If it were not, she should have advised waiting for a more favorable condition of things. She gave no note of warning. If what occurred was inevitable, she should have forecasted it, and refused to proceed."

Applying this law to the situation of the tug Printer as disclosed by the testimony on the occasion in controversy, the conclusion is inevitable that, in venturing to cross the bar with the Fidelity in tow under the prevailing conditions, the tug was guilty of gross and

inexcusable carelessness and negligence. But the respondents go further, and make the claim that there was such privity and knowledge between the owner and master of the tug in the negligence and unskillfulness of the latter as to take the case out of the provisions of the limited liability act. In the view I take of the amount of damages proven to have been sustained by the respondents, this question does not become important. The value of the Fidelity was $12,000, but the claims of the part owners to the amount of only 9-32 have been presented. The court is therefore only concerned with these interests which, upon the valuation found, have sustained damages to the amount of their interest, to wit, $3,375. L. H. Christopherson was the master of the schooner Fidelity, and was drowned at the time she was lost. He was 35 years of age, and was in receipt of wages to the amount of $100 per month. He left a widow and two children. Hans C. Pederson was the cook on board the schooner, and was drowned. He was 39 years of age, and was in receipt of wages to the amount of $50 per month. He left a widow and three children. The amount of pecuniary damages sustained by a family in the loss of one who has provided for its support is a difficult question for determination. The verdicts of juries in such cases take a wide range, unless restrained by a limitation in the law or by the interposition of the court. In some of the states the amount that can be recovered in such a case is limited to $5,000. In two states the limit is $10,000. In California the only legislative provision upon the subject is that contained in section 377 of the Code of Civil Procedure, which provides that "such damages may be given as under all the circumstances of the case may be just." As was said by Justice De Haven in Morgan v. Southern Pac. Co., 95 Cal. 521, 30 Pac. 603, this means "that such damages are to be measured by what shall fairly seem the pecuniary injury or loss to the plaintiff." Consideration should therefore be had of the uncertainty of continuous or regular employment, and the probable physical capacity to continue to earn wages for any certain number of years. Moreover, the gross earnings of the head of a family do not always indicate his value in providing for the support of others. His calling may require personal expenditures, or his habits or mode of life may be extravagant. These and other elements that might be mentioned make the productive value of a man's life extremely uncertain, and beyond any estimate contained in the annuity tables. Kelley v. Railroad, 48 Fed. 663; Cheatham v. Red River Line, 56 Fed. 248.

In view of all the facts in the present case, I will fix the damages caused by the death of L. H. Christopherson at $7,000, and the damages caused by the death of Hans C. Pederson at $5,000. The damages awarded to the owners who have presented their claims will be proportionate to their respective interests. A decree will be entered in favor of the respondents for the amounts named.