THE HERCULES.

THE SEA QUEEN.

In re SHIPOWNERS' & MERCHANTS' TUGBOAT CO.

(District Court, N. D. California. May 28, 1897.)

TOWAGE—DUTY OF TUG—BUOY MARKING OBSTRUCTION.

The master of a tug plying in a busy harbor is not justified in relying absolutely upon the presumption that a buoy, placed by the government to indicate a dangerous obstruction to navigation in such harbor, is in its proper position, but is bound, especially when towing a large ship past the obstruction, to observe the bearing of such buoy, and watch for any change in its position, and to be so familiar with the actual location of the obstruction as to be put on his guard by a displacement of the buoy amounting to 200 feet in distance and making a difference of a point and a half in its bearing.

Page, McCutchen & Eells, for petitioner.
Andros & Frank, for claimants.

MORROW, District Judge. A petition for limitation of liability, under sections 4282–4285, Rev. St., was filed December 30, 1895, by the Shipowners' & Merchants' Tugboat Company, owner of the steam tugs Hercules and Sea Queen. The petition asked for a limitation of liability with respect to the Hercules. By an amended petition, filed January 10, 1896, the Sea Queen was also included. The petition and amended petition were filed, in view of certain claims for damages having been made against the tugs, aggregating about $20,-000, to limit the liability of the owner to the value of said tugs, if

it should be determined that there is any liability. The principal claim for damages against the tugs is that involved in a libel instituted in this court by Arthur Sewall and others against the steam tugs Sea Queen and Hercules, in the sum of $20,000, for alleged negligence on the part of those in charge of said tugs in towing the ship Benjamin F. Packard on a rock in the Bay of San Francisco. The further prosecution of this suit was restrained and enjoined by an injunction issued to the petitioner on April 9, 1896, and a monition was issued, returnable July 14, 1896, citing all persons claiming any damages for any loss arising out of the stranding of the ship Benjamin F. Packard to appear before Southard Hoffman, a commissioner, and make due proof of their respective claims, and answer the petition for a limitation of liability. Two claims have been presented,—one, as has been already stated, by Messrs. Arthur Sewall and others, claiming damages in the sum of $20,000. The other claim is presented by the firm of Balfour, Guthrie & Co., in the sum of $484.54, for damages to a portion of the cargo of wheat, alleged to have been caused, also, by the negligent stranding of the ship by the tugs.

The petition and amended petition set up, in brief, that certain claims have been made upon the steam tugs Sea Queen and Hercules, owned by the petitioner, for damages alleged to have arisen from the stranding, on Mission Bay Rock, on December 3, 1895, of the ship Benjamin F. Packard; that the said stranding was not caused by any incompetency or negligence of the master of the steam tug Hercules, or the unseaworthiness of said tug; that the Sea Queen took no part in the actual towing of said ship, but was simply attached by holding lines to the ship, having been somewhat disabled by unseating her funnel before the towing had commenced in striking against the ship's mainyard; that the cause of the stranding and damage to the ship and cargo was the fact, solely, that the buoy, which indicated where the submerged Mission Bay Rock was located, had, for some cause unknown to the petitioner, been moved, and was not, at the time of the towage aforesaid, in the place in which it had been for many years previous to the date of the stranding, or in which it was designated by the chart as being, and in which the master of the Hercules believed it to be; that, on the contrary, the said buoy had been moved from its said usual place and designated point to a distance of more than 200 feet from the position which it had once occupied, and to a point considerably to the southward of the northwesterly side of said rock; that, in consequence of the said change of the danger buoy, the master of the tug Hercules was deceived as to the course that he should take in moving the said ship, so that the course actually taken by him, though apparently, by reason of the actual location of the buoy, a distance of nearly 200 feet from the rock, was in fact in the direction of the rock; that whatever loss or damage or injury was done to the ship Benjamin F. Packard or to the cargo was done without the privity or knowledge of the petitioner.

The answers filed by both of the claimants set up, substantially, that the stranding of the ship Benjamin F. Packard, and the conse-

quent damage to the ship and her cargo, were caused by the careless, negligent, and unskillful manner in which those having charge of the tugs attempted to perform said service. With respect to the position of the buoy, the answer of Messrs. Sewall and others denies:

"That the accident to said vessel was caused entirely, or at all, by reason of the fact that said buoy had been removed from the place it had at some other time occupied, or that said accident was not brought about by any incompetency or negligence of said master of said tug."

With reference to the averments in the amended petition that the Sea Queen did no towage service to said ship, the answer of the same claimants denies, on information and belief:

"That the said tug Sea Queen did no towage service to said ship thereafter and before the stranding of said ship, or that said tug was merely attached to said vessel while the funnel of said tug was being replaced. On the contrary, they aver, on information and belief, that said tug Sea Queen was, immediately after said ship had been started away from said wharf, engaged in towing her in connection with said tug Hercules; that said tug Hercules was made fast on the quarter of said ship, and the said Sea Queen was made fast near the bow of said ship; and that, immediately after getting clear of said wharf, both of said tugs were under steam, and engaged in towing the said vessel at the time of said accident."

From the issues as thus made up three questions arise: (1) Whether the stranding of the ship Benjamin F. Packard arose or was caused by any negligence on the part of both of the tugs, or either of them, in towing the ship; (2) whether the Sea Queen participated or had anything to do with the towing of the ship; and (3) whether the liability of said tugs, or either of them, should be limited to their value, or whether there was such privity or knowledge on the part of the owners of the tugs as to justify holding them personally responsible, and denying their petition for a limitation of liability.

The principal question of fact involved, upon the determination of which the right of the petitioner on the one hand to a limitation of liability or a decree absolving it from all liability, and the right of the claimants on the other hand to recover against the petitioner, alike depend, is whether the stranding of the ship on Mission Bay Rock, while being towed, was caused by the negligence, carelessness, and unskillfulness of those in charge of the towing, or whether, under the circumstances, it was excusable. Considerable testimony has been introduced by both sides. The leading facts are these: On December 3, 1895, the ship Benjamin F. Packard was lying on the north side of Long Bridge wharf, in the Bay of San Francisco. She was starboard to the wharf, and headed outward, to the southeastward. She had a gross tonnage of 2,130.21 and a net tonnage of 2,025.72, and was 244.2 feet in length, 43.3 feet in breadth, and 26.8 feet in depth. She was built in 1883 at Bath, Me. At the time of the stranding she was partially loaded with a cargo of 2,800 or 2,900 tons of wheat and barley. It became necessary to move her from the wharf into the stream for the purpose of completing her loading. The Shipowners' & Merchants' Tugboat Company was employed to perform that service. The steam tug Sea Queen went to the ship, and reached her some time between 10 o'clock and 10:30 of the morning of the 3d of December, 1895. The ship was to be towed out on the ebb tide. It ap-

pears that the Sea Queen, in going around the ship, fouled the main-yard of the latter, and her funnel or smokestack was unseated. Besides this, the collision broke the whistle pipe, and put the escape pipe out of condition. The smokestack guys, excepting one, were carried away, and several injuries of a minor character sustained. This disabled the Sea Queen for towing purposes. As the captain of the Packard was anxious to go out on that tide, the master of the Sea Queen, accompanied by the captain of the ship, went to a telephone office on the wharf and requested that another tug be sent out. Thereupon, the steam tug Hercules was sent out. While the latter tug is not quite as large nor as powerful a tug as the Sea Queen, still it satisfactorily appears that she was amply sufficient to tow the Packard; certainly so under the conditions then prevailing. The registered dimensions of each tug are as follows: The Her-cules was 90 feet in length, 21 feet in breadth, and 11.9 feet in depth. She had a gross tonnage of 96.71, and a net tonnage of 48.36. The Sea Queen was 100.5 feet in length, 22 feet in breadth, and 11.8 feet in depth. She had a gross tonnage of 111.15, and a net tonnage of 55.58. The horse power of each tug, as testified to, was: The Her-cules, 635; the Sea Queen, 691. The weather was good, and the tide, as stated, ebb,—just a light ebb when the towing actually be-gan. Meanwhile efforts had been made to set up the smokestack of the Sea Queen, which, it appears, had been only partially successful. The tug Hercules was made fast for towing at the port quarter. After the accident to the Sea Queen, the latter was moved abreast of the forerigging, under the foreyard, and on the same side on which the Hercules was made fast. Both tugs were heading with the ship.

There is a conflict in the testimony as to whether the Sea Queen was made fast for towing purposes, and as to whether she actually rendered any assistance in towing. It will, therefore, be necessary to determine this question at the outset. The testimony on the part of the petitioner tends to show that she was not made fast for tow-ing; that at no time until after the accident did she assist in the towing; that when the towing began she was made fast by two small lines, called "holding lines," and shortly after the towing be-gan by one small line only. To use the language of her master:

"After knocking over the smokestack, I hauled up alongside the forerigging of the ship. I got one headline out onto the shankpainter bitt that they use to hang the anchor in. That was what the headline was fastened to. The sternline consisted of what we use for a messenger, a three or three and one-half inch line with a hook in it, and that hook was hooked into the second or third chain plate in the main rigging. It was not fast at all."

The testimony on the part of those on board the ship tends to show that the Sea Queen was made fast for towing purposes, and that she did render towage services. But this testimony is unsatis-factory and in some respects unreliable. The captain of the ship states unequivocally that the Sea Queen was made fast when the towing first began, and that she was not afterwards moved forward, whereas several of the witnesses on board the ship testify that the Sea Queen was first moved forward some 35 or 40 feet and then made fast for towing. This conflict between their statements in

this and other respects does not commend their reliability as witnesses on this question. It may be that these witnesses did not notice very particularly how the Sea Queen was made fast, whether for towing purposes or not. Perhaps, the fact that the Sea Queen accompanied the ship when the towing began, and was made fast to her by the two small ropes referred to, led these witnesses on board the ship to believe that the Sea Queen was actually towing. But, in my opinion, they were mistaken. The positive, unequivocal, and corroborated testimony of the witnesses for the petitioner who testified on this point is to the effect that the Sea Queen, at no time during the towage prior to the stranding, did any towing; that, while her engine was not disabled for towing, in other respects she was not in a condition to tow; that her whistle pipe was broken, and she could not have given the proper signals had any been required; that she was not made fast for towing; that she was simply made fast, so as to remain by and keep up with the ship until the latter had been towed to a proper anchorage in the stream, when it was intended to make a further effort to right the smokestack by using the ship's yard; that the small ropes by which she was hanging onto the ship were not fit nor used for towing; that after the towing began, and the wharf had been cleared, the tug Hercules backed, and that the effect of this movement was to throw the backwater towards the stern of the Sea Queen, which gave her the appearance of towing; that she was not towing, but, on the contrary, when the backwater affected the stern of the Sea Queen, it caused the small "holding on" line, which extended from the stern of the Sea Queen to the second or third chain plate in the main rigging, to be wrenched from its place,—that is, the hook attached to this small line was straightened out completely, and lost its hold; that this caused the tug Sea Queen to surge ahead a few feet, and widened the distance between the stern of the tug and the side of the ship; that thereafter the tug was only holding on by one small line, the one extending from the forward end of the tug to the shankpainter bitt; that this one line, in the manner in which it was made fast, was absolutely useless for towing.

Without further entering into detail in the testimony, or attempting to reconcile the various conflicting statements of the witnesses on this point, I am convinced that the Sea Queen was not made fast for towing, and that she did not, in fact, tow or attempt to tow the ship until after the latter had struck and become fast on the rock, when for the first time she left her position forward on the port side of the ship, and went around to the starboard of the vessel, and made ineffectual attempts, in conjunction with the Hercules, to tow the ship off the rock. In this connection, the testimony of Henry P. Marshall, captain of a tugboat belonging to a competing line of tugboats, is very significant. He appears to be an absolutely disinterested witness. He noticed the ship Packard, with the tugs Hercules and Sea Queen, while he was towing a vessel in that locality himself. He observed the Sea Queen both before the towing began and afterwards. He swears that she was not made fast for towing, and that the position she occupied on the port side of the ship un-

der the forerigging was not a proper place for towing, and that a tug in that position could not render much assistance to a ship. The further fact that the tug Hercules was perfectly able and thoroughly equipped to do the towing herself strengthens the conviction I hold that the Sea Queen did not do any towing, and did not contribute in any degree to the stranding of the ship on Mission Bay Rock. All the orders were given by the master of the Hercules, and he swears that he gave no orders for towing to the master of the Sea Queen, and the latter testifies that he received no orders to assist in the towing, and in this respect they are corroborated by other witnesses. It is true that, after the ship struck the rock, and became fast to it, the Sea Queen left her place on the port side of the ship, and made fast to the starboard quarter, and attempted to assist in towing the ship off the rock. But there is nothing inconsistent in this with the fact that she did not do any towing previously. As stated, her engine was not disabled, but her smokestack was out of its place, and had been only partially restored, and her whistle pipe was broken. This damage did not interfere with her using the engine to tow when it became absolutely necessary to save the ship, if not from any great danger, at least from damage by remaining on the rock for any length of time. It is to be observed that she did not require her whistle in this particular, as she might have required had she been navigating the harbor. Her towage was of a stationary nature, if it can so be termed; that is, it was devoted to getting the ship off the rock.

The question, as to whether or not the Sea Queen participated in the towing prior to the stranding, or in any wise contributed thereto, having been settled, I now proceed with the statement of the principal facts. The towing by the Hercules began, according to the testimony of her master, precisely at 12:10 of that day. Nearly opposite the wharf at which the ship had been docked, some 475 feet away, are a number of submerged rocks known as "Mission Bay Rocks." On the northernmost one of these rocks is a ledge or pinnacle upon which, or as near thereto as is practicable, a buoy is placed, known as "Mission Rock Buoy." It is in about 12½ feet of water, and is designated in the official publication, by the government, of the "List of Beacons, Buoys, and Day-Marks, on the Pacific Coast of the United States, Corrected to December 1, 1894," as follows:

"Name of station or locality of aid: 'Mission Bay Rock.' Color of aid: 'Red and black horizontal stripes.' Description of mark or aid: '3d class nun buoy.' Compass bearings and distances of prominent objects from the aid: 'Oakland Harbor Lighthouse, N. E. ¾ N. Potrero Point, S. S. E. ¼ E. Point Avisadero, S. E. ¼ S.' General remarks: 'Near the shoalest part of the rock, on which is a depth of 12½ feet at mean low water. May be passed on either side by giving it a good berth.' "

It is not denied that, on the occasion when the ship struck this shoal, the buoy, through some cause or other, had been moved or displaced some 200 feet away and southeast from its designated place. Nor is there any dispute about the fact that the master of the Hercules did not know that the buoy had been displaced. Upon leaving the wharf, the master of the Hercules gave orders that the wheel

of the Packard be put hard a-port. The object of this was to hold her bow against the tide, which was ebbing, and which would strike her starboard bow. In this way she was kept straight, and her quarter cleared the wharf without any trouble. Having towed clear of the wharf, the master of the Hercules stopped, backed, and steadied his wheel. This was for the purpose of stopping the vessel from reaching too far ahead, and its effect was to swing the vessel around to port, and let her drop down clear of the buoy, which would then be upon his starboard bow. When the master of the Hercules considered that the ship was a sufficient distance from the buoy to pass by and get around the submerged rock in safety, he sent the ship ahead, and almost immediately after the vessel fetched up; that is, the stem of the ship struck, and became fast upon the rock. All this occupied about five minutes; that is, from the time they left the wharf to the time when the ship struck Mission Bay Rock, as stated. Attempts were made by both the Hercules and the Sea Queen to tow the vessel off, and they were afterwards assisted by other tugs, but these efforts were unsuccessful at that time. The ship was afterwards pulled off at the next flood tide. She was found to be considerably damaged, to be leaking badly, and was towed upon the Mission mud flats. A portion of her grain was damaged by water. In this statement of facts I have made no attempt to go into details, nor to explain or reconcile contradictions, inconsistencies, and inaccuracies. I have simply stated the principal facts as I have, after careful consideration, found them to be.

We come, now, to the important question in the case, and that is whether or not the master of the Hercules was guilty of negligence in towing the ship on Mission Bay Rock. It is contended, on the part of the petitioner, that the accident was excusable and inevitable, owing to the fact that the buoy had been removed and was misplaced, thereby deceiving the master of the tug as to the course which he should take in towing past the rock. On the other hand, it is contended by the claimants that, although the buoy had been removed some 200 feet from its habitual and correct position, yet that the master of the tug should have noticed this displacement of the buoy, and that he was bound to know, at least approximately, the locality of the submerged rock. The determination of this question involves the duty of the tug towards her tow. It may be observed that no question is raised as to the competency of the master of the tug, nor of the fact that the general course he attempted to take with the ship would have been proper had not the buoy been displaced. It appears, from the testimony, that the captain of the ship preferred a tug of greater power than the Hercules. But the evidence shows conclusively that the Hercules was sufficiently powerful and well-equipped to tow the ship without any assistance whatever from the Sea Queen, and that the service would have been easily and satisfactorily rendered had it not been for the stranding of the ship on the rock referred to. There is no question but that the tide and weather were favorable and conducive to safe towage. In fact, the only question upon which it is sought to base negligence on the part of the master of the Hercules is whether he should

not have noticed the displacement of the buoy, and should have been sufficiently familiar with the position of the hidden rock to have avoided it with safety.

The general principles, which apply to the duties of tugs, are aptly stated by the supreme court, in The Margaret, 94 U. S. 494, as follows:

"The tug was not a common carrier, and the law of that relation has no application here. She was not an insurer. The highest possible degree of skill and care were not required of her. She was bound to bring to the performance of the duty she assumed reasonable skill and care, and to exercise them in everything relating to the work until it was accomplished. The want of either in such cases is a gross fault, and the offender is liable to the extent of the full measure of the consequences. * * * She was bound to know the channel, how to reach it, and whether, in the state of the wind and water, it was safe and proper to make the attempt to come in with her tow."

In The Effie J. Simmons, 6 Fed. 639, it was held that a tug is bound to know the nature of the bottom, as well as the depth of the water in which it is being employed.

In The Henry Chapel, 10 Fed. 777, it was said by Nelson, District Judge:

"The rule of law is perfectly well settled that a tug undertaking to tow a vessel in navigable waters is bound to know the proper and accustomed waterways and channels, the depth of water, and the nature and formation of the bottom, whether in its natural state, or as changed by permanent excavations. When all these conditions, as they exist, admit of safe towage, the tug is responsible for any neglect to observe and be guided by them."

In The Vigilant, 10 Fed. 765, a tug was held liable for the loss of her tow in consequence of stranding her upon a depression or hole in the surface of the bar over which she was being towed.

In The Robert H. Burnett, 30 Fed. 214, it was said that a tug "was bound to use reasonable skill and care, and to know the condition of the bottom and depth of water of the river which she was navigating." The tug was held liable for not being aware of the existence and location of a well-known reef. The court said:

"The captain of the tug testifies that he had been running on the river for a year or more, but that he had no knowledge of the position of this rock, and had never heard of the reef. This admission of ignorance of notorious facts, about which there can be no question, leaves him without any excuse for going so near to the western shore as he did."

See, also, Cushing v. The John Fraser, 21 How. 184; The Quickstep, 9 Wall. 665; The Cayuga, 16 Wall. 177; The New Philadelphia, 1 Black, 62; Brown v. Clegg, 63 Pa. St. 51; Wooden v. Austin, 51 Barb. 9; Wells v. Steam Navigation Co., 8 N. Y. 375; The Narragansett, 20 Fed. 394; The Ellen McGovern, 27 Fed. 868; In re Humboldt Lumber Manuf'rs' Ass'n, 60 Fed. 428, 443.

Applying the law as established by these cases, it follows that the master of the Hercules should have had such familiarity with the location of Mission Bay Rock, even though the buoy, indicating where it was, had been displaced some 200 feet. That distance, at the short range from Long wharf, where the towage began, was sufficient to have been observed by a careful pilot. The difference in position between the buoy from the place where it should have been

to where it was, from Long wharf, was about 20° of arc or nearly 2 points of the compass. The displacement was in a southeasterly direction, and the distance when riding with an ebb tide was about 170 feet, and when riding with a flood tide was about 210 feet, from the pinnacle. This displacement was certainly sufficient to apprise the master of the Hercules that something was wrong with the position of the buoy, if he had given it any attention whatever. It should have put him on inquiry. He did not take any bearings to ascertain whether the buoy was in the correct position.

It is claimed that he had no opportunity, and that he was not required to, as he had a right to rely upon the buoy; that it was a signal of danger placed by the government, which was presumed to be correct. While it is true that there is a presumption that the buoys correctly indicate the places of danger, still it does not justify navigators, particularly masters of tugs, who are selected and employed for their supposed familiarity with obstacles to navigation in crowded harbors, in following blindly these signals of danger. On the contrary, the very efficiency of the tugboat service requires that masters should be on the watch for any change in signals of danger, so that the places of danger themselves may be avoided, and property and perhaps life saved from loss. It is a well-known fact that buoys are apt to be moved, and this fact should put masters of tugs on the alert to ascertain whenever a displacement has occurred. In the case at bar it would seem, from the testimony of the master of the Hercules, that he did not even look to see whether the buoy was in place or not. He testified, on cross-examination, as follows:

"Q. In the place where it [the buoy] was on the day of the accident, December 3, 1895, was it further out than the 12½-foot rock,—I mean, further to the eastward? A. I did not notice it being out. Q. Did you take any notice at all to see where it was? A. No, sir; to tell the truth, I did not,—not then. I was too busy about the ship."

Certainly there was no more important duty devolving upon the captain of the tug than to ascertain the location of an obstruction he was about to move around with a large ship. The master of the tug Sea Queen himself admits that he did not look to see whether the buoy was in its proper place, or whether it had been moved away. However, as he was not in command of the towage service, and as his tug did not contribute to the towing, any inattention or failure to observe the displacement of the buoy is immaterial, so far as the result of the case is concerned. But it tends to show that too much reliance is placed by masters of tugboats on the correctness of the positions of buoys.

Upon all the facts of the case, I think that the stranding of the ship Benjamin F. Packard was due to the negligent towing on the part of those in charge of the tugboat Hercules in the particular above indicated. But, as there is no proof of any privity or knowledge of this negligence on the part of any of the members of, the company, the owner of the tug, the liability will be limited to the appraised value of the tug,—the sum of $4,000. A decree will be entered in accordance with the views expressed in this opinion.